Andrew Tell Investment Co., et al, 1 Petitioners v. Commissioner. Andrew Tell Inv. Co. v. CommissionerDocket Nos. 3986-67 - 3992-67.United States Tax CourtT.C. Memo 1970-130; 1970 Tax Ct. Memo LEXIS 227; 29 T.C.M. (CCH) 547; T.C.M. (RIA) 70130; May 28, 1970, Filed Robert D. Collins, 700 Phoenix Title & Tr. Bldg., Phoenix, Ariz.,and Allen L. Feinstein, for the petitioners. Richard Rink, for the respondent. TIETJENSMemorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies in income tax of petitioners in these consolidated*229 proceedings as follows: PetitionerTaxable YearDeficiency 2Overas-EndingsessmentAndrew Tell Investment Co.,9-30-61$8,781.92Docket No. 3986-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,617.679-30-636,152.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,750.58Tell Investments Co., Docket9-30-6111,959.28No. 3987-679-30-62None9-30-63None9-30-64None$95.03Ambel Investment Co., Docket12-31-612,106.52No. 3988-6712-31-6218,571.0712-31-6313,491.6612-31-644,962.49Andrew P. Tell and Mary J.12-31-6158,477.06Tell, Docket No. 3989-6712-31-6228,590.0712-31-63618.9612-31-6470,500.90Tell Construction Co., Docket6-30-62679.94No. 3990-676-30-632,667.756-30-642,472.03Tell Land Co., Docket No.3-31-62370.493991-673-31-63617.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.653-31-655,462.68Mary Tell Investment Co.,9-30-6115,008.64Docket No. 3992-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,430.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,504.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,524.29*230 We must decide whether Andrew P. Tell and members of his family acquired control of the petitioner corporations (other than Investments) for the principal purpose of evading or avoiding Federal income tax by securing the benefit of additional surtax exemptions, as provided by section 11(d) of the Internal Revenue Code of 1954. 3 We must also decide whether the gains petitioners realized from their sales 549 of certain real estate properties must be taxed as ordinary income. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation and the exhibits attached thereto are incorporated herein by this reference. Petitioners Andrew P. Tell ("Tell") and Mary J. Tell, husband and wife (together referred to as "the Tells"), resided in Phoenix, Arizona at the time they filed their petition herein. They filed joint Federal income tax returns for the years here involved with the district director of internal revenue in Phoenix, Arizona. Each of the six petitioner corporations maintained its principal office in Phoenix, Arizona*231 at the time it filed its petition in this case. Each corporation filed its Federal corporate income tax returns for the years here involved with the district director of internal revenue in Phoenix, Arizona. In 1945 Tell moved to Phoenix where he purchased citrus property. Because of a succession of freezes his citrus business was not financially successful. A portion of the property was subsequently traded for acreage which Tell platted as Tell Acres (15 residential lots) and Cadillac (18 residential lots). These lots were all sold. Tell acquired the land with the intention of subdividing it and selling lots. The gain from the sale of these lots was reported as ordinary income. Shortly after his arrival in Phoenix, Tell had also acquired a small foundry. Cessation of World War II caused cancellation of the foundry's contracts and, in 1947, the foundry went out of business. The foundry building was located on 4 acres of land zoned industrial. Tell was approached by a telephone company about leasing the empty foundry building. Tell obtained financing for expansion of the building to meet the telephone company's needs. The expanded building was then leased to the telephone company. *232 On the remaining acreage he constructed two warehouses, for lease to Spiegel's of Chicago, and Goodyear Tire and Rubber, obtaining financing again and contracting out the construction. Tell thus began the development of real property for industrial use. In the beginning when opportunities arose to build other buildings and land other than the foundry acreage was required, Tell purchased lots from Elias Romney out of a platted subdivision known as Central Industrial District. Subsequently Tell began to acquire acreage he thought lay in the path of industry, rather than continuing to buy land on a need basis and he decided to undertake the business from the "ground up": develop the land; secure financing; construct a facility; and lease the complete facility. While the construction work in the beginning had been contracted out, in the early 1950's, Tell secured a general contractor's license, qualifying him to perform not only his own construction work but construction work for others. In 1956 Tell was engaged in the contracting business under the name "Tell Construction Company." In 1952 Tell began the development of Tell Industrial District, the first of several industrial districts*233 he was to develop. The Tells purchased a 40-acre parcel for $61,000, payable by January 1, 1963, which Tell subdivided as Tell Industrial District, consisting of tracts A and B and lots 1 through 35. The land was acquired to continue industrial development and for investment. Land in this district is no longer owned by the Tells, having been disposed of by gift of a large parcel (the Sloan Transfer Company Building) to the Tell Foundation, two sales of parcels (10 and 15 acres), a number of lot sales to the same buyer such as Empire Stores, Allied Steel, Helfin Steel, and a platting company, and other individual sales. In 1954 the Tells purchased a 60-acre parcel which he subdivided as Grand Industrial District, consisting of lots 1 through 56 and tracts A through F. Costs of this district aggregated $292,966.43, consisting of expenditures for land, surveying, engineering, water lines and roads. The Grand Industrial District was acquired by the Tells to continue a program of industrial land development. In 1955 the Tells acquired land which Tell subdivided into the Payne Industrial District (tracts A through E, tract L, and lots 1 through 13) and Payne Industrial District Unit*234 Two (lots 15 through 30, tract N, and an exception). The aggregate cost of Payne Industrial District, Units One and Two, was $348,203.94, consisting of expenditures for land, surveying, engineering, zoning, utilities and roads. This acreage was acquired to continue a program of industrial development. Tell also acquired approximately 800 acres of land in Casa Grande, Pinal County, a portion of which in 1957 he subdivided as 550Midway Industrial District consisting of lots 1 through 24 and tracts A through C. In early 1957, the Tells entered into a partnership with James A. Rae and Alva Rae for the development of acreage to be known as the Rae Industrial District. The land acquired was subsequently subdivided by the partnership into Rae Industrial District Unit One (21 lots) and Rae Industrial District Unit Two (tracts A through C and 15 lots) and a subdivision plat recorded. The Tell-Rae partnership was dissolved in the latter part of 1958. Land acquired by Tell upon dissolution of the Tell-Rae partnership was subsequently subdivided by Tell as Rae Industrial District Unit Three (lots 40 through 75 and exceptions A and B) and a subdivision plat recorded. A water line extension*235 agreement was entered into on December 9, 1959, with the City of Phoenix in respect to Unit Three. The aggregate cost of Rae Industrial District Unit Three was $131,912.89, consisting of expenditures for land, surveying, utilities and roads. On September 24, 1957, Tell and Rae, with their wives, formed Tell-Rae Investments, a corporation. Each couple acquired 500 shares of its capital stock for $5,000 cash. Formation of Tell-Rae Investments was prompted by Rae who believed a corporation might prove advantageous from a personal liability standpoint and would serve as a means of segregating certain leasing activities of Tell and Rae from the partnership's business of industrial development. Prior to 1958 Tell had constructed primarily for himself. As a general contractor, however, he was qualified to perform construction work for others. Tell believed that a separate corporation with the attribute of limited liability which would handle all construction activity and which would engage only in construction activity would be the most appropriate manner of continuing to function in the hazardous construction business. As a consequence of this belief, Tell Construction Co. ("Construction") *236 was incorporated on Febraury 21, 1958, for the purpose of engaging in the construction business. Upon incorporation the Tells transferred the construction office building, a rental building located on the same lot (the Orange Julius Building), various items of construction equipment and cash to Construction in exchange for 1700 shares of Construction stock. Another 300 shares were issued for cash to other members of the Tell family. These shareholders' interests remained substantially unchanged throughout the taxable years in question. Since its incorporation Construction has completed numerous contracts, most of which have been with the petitioner corporations, Tell, or a trust for the benefit of one of Tell's daughters. Of the remaining contracts with unrelated parties several were for construction of improvements of buildings in respect to land or buildings which Tell had owned at one time or which he had constructed. Several contracts were with unrelated parties and were for construction on land which Tell had not previously owned or improved. From the time of its incorporation through June 1964, Construction entered into five cost plus contracts. Since the formation of Construction, *237 neither Tell individually nor any of the petitioner corporations has engaged in construction work; Construction has constructed all buildings for Tell and for the petitioner corporations. At about the same time he decided to incorporate his construction activities Tell decided to separate the function of investing in commercial rental propetries from his activities of commercial land development which he continued to engage in in his individual capacity. He intended the leasing of industrial buildings to become the business of separate corporations in the same manner in which he and Rae had segregated their leasing activities from their business of industrial land development. Tell chose this time also as the appropriate occasion the case before us. See, e.g., J. W. Solof, each of his daughters and to his grandchildren. Tell has four daughters: Esther Rhodes ("Esther"), born in 1930 and married to Benny B. Rhodes; Marilyn Hamman ("Marilyn") born in 1935 and married to Floyd Hamman; Elisabeth Senseman ("Elisabeth"), born in 1941 and married to Paul Senseman from whom she has been divorced; and Lydia Lewis ("Lydia"), born in 1946 and married to Ronald Lewis. There were at this time*238 two trusts being administered by the Phoenix Title and Trust Co. ("Phoenix Title"), as trustee, one for each of his then minor daughters, Elisabeth and Lydia. Tell had conscientiously tried to equalize gifts to his four daughters. Gifts to the older two, Esther and Marilyn, had been made directly to them, and gifts to Elisabeth and Lydia had been made to the 551 respective trusts for their benefit. To implement this general plan, Andrew Tell Investment Co. ("Andrew Tell") and Mary Tell Investment Co. ("Mary Tell") were incorporated on February 28, 1958 for the purpose of investing in and leasing commercial rental properties. Andrew Tell was eventually to be Esther's corporation. Mary Tell was eventually to be Marilyn's corporation. Temporarily, other members of the Tell family were to participate in Andrew Tell and Mary Tell. The Phoenix Title trusts for Elisabeth and Lydia were to continue as vehicles for investments for each of them. Tell Land Co. ("Land") was also incorporated on February 28, 1958, for the purpose of investing in and leasing commercial rental properties. Land was to be an investment vehicle for Tell's grandchildren, holding property to be conveyed to it by*239 Tell, which was beyond the limits of the City of Phoenix and which was not of any significant value, for long-term appreciation. In 1958 Tell owned approximately 240 acres near Buckeye Road and 59th Avenue beyond the limits of the City of Phoenix and approximately 800 acres of desert land near Casa Grande, Pinal County, Arizona. This land was regarded by Tell as a logical asset to be transferred to Land. Except for approximately 10 acres of the 240 acres near Buckeye Road and 100 acres of the 800 acres near Casa Grande, Land still owns the Buckeye and Casa Grande acreage transferred by Tell upon incorporation. By September of 1958, Andrew Tell and Mary Tell had operated for approximately 6 months and Tell was satisfied with his experience with these two corporations. A corporation seemed to be the logical vehicle to succeed the Phoenix Title trusts for Elisabeth and Lydia which were to terminate when they each reached majority. Ambel Investment Co. ("Ambel") was incorporated September 11, 1958, for the purpose of investing in and leasing commercial rental properties. Participation in Ambel was limited to Elisabeth and Lydia as Tell no longer believed complete family participation*240 in each corporation desirable. In December 1958 Tell-Rae Investments redeemed the Raes' stock and Tell-Rae Investments was renamed Tell Investments ("Investments'). Participation by Tell's daughters in Investments was limited to Elisabeth and Lydia. Investments was eventually to become Lydia's corporation. Each of Tell's daughters understood, prior to the taxable years in question, that eventually she would control "her corporation" through ownership of a majority of its stock. Each daughter was encouraged to invest in her corporation by contributing property and cash to the corporation in exchange for its stock. The original shareholders of the petitioner corporations (except Investments discussed above) and the consideration received for their shares were as follows: Andrew TellStockholdersSharesDollar AmountType of ConsiderationofConsiderationAndrew and Mary Tell10,300$103,000Arizona ContainerBuildingGeneral Tire BuildingNatural Rock BuildingPrecision BuildingSun Signs BuildingStar BuildingEllis BuildingEbco BuildingFormette BuildingRitter BuildingCash ($487.13)Benny Rhodes50500Cash ($500)Esther Rhodes1,00010,000Milgram BuildingCash ($3,144.93)Floyd Hamman50500Cash ($500)Marilyn Hamman50500Cash ($500)Elisabeth Tell (Trust)1,20012,000Cockrill BuildingLydia Tell (Trust)1,20012,000Snow Cap Building,7th Ave.Robert Weaver110Cash ($10)James Smith110Cash ($10)13,852*241 552 Mary TellStockholdersSharesDollar AmountType of ConsiderationofConsiderationAndrew and Mary Tell5,000$50,000Belview BuildingCohen BuildingGuano BuildingInland BuildingLoftin BuildingFurniture Mart BuildingAir Draulics BuildingSouthwest MetalsBuildingVaughn BuildingArizona WeldingBuildingCash ($1,488.70)Plymouth AutomobileBenny Rhodes50500Cash ($500)Esther Rhodes50500Cash ($500)Floyd Hamman50500Cash ($500)Marilyn Hamman1,00010,000Promissory Note($10,000)Elisabeth Tell (Trust)1,50015,000Soule BuildingLydia Tell (Trust)1,50015,000Snow Cap BuildingRobert Weaver110Cash ($10)James Smith110Cash ($10)9,152*10AmbelAndrew and Mary Tell2,500$25,000 W. 160 S. 200 Ex. 190Tract A, PayneIndustrialSnackmobile BuildingWayne Plastics BuildingCash ($20,500)Elisabeth Tell1,000$10,000Promissory Note($10,000)Lydia Tell1,00010,000Promissory Note($10,000)Robert Weaver110Cash ($10)4,501*10InvestmentsAndrew and Mary Tell5005,000Cash ($5,000)J.R. and A.M. Rae5005,000Cash ($5,000)1,000*10LandAndrew and Mary Tell14,000140,000Midway LandTidwell BuildingJackson LotsDrane PropertyW. Buckeye RoadCash ($1,125.93)Benny Rhodes50500Cash ($500)Esther Rhodes1,00010,000Promissory Note($10,000)Floyd Hamman50500Cash ($500)Marilyn Hamman1,00010,000Promissory Note($10,000)Elisabeth Tell5005,000Promissory Note($5,000)Lydia Tell5005,000Promissory Note($5,000)Robert Weaver110Cash ($10)James Smith110Cash ($10)17,102*242 ConstructionStockholdersSharesDollar AmountType of ConsiderationofConsiderationAndrew and Mary Tell1,700$17,000Orange JuliusBuildingConstructionBuildingsCash($3,110.92)PromissoryNote($6,667.43)Benny Rhodes50500Cash ($500)Esther Rhodes50500Cash ($500)Floyd and Marilyn1001,000Cash ($1,000)HammanElisabeth Tell50500Cash ($500)Lydia Tell50500Cash ($500)Robert Weaver110Cash ($10)James Smith110Cash ($10)2,002The following schedules show how the stock of each petitioner corporation was held from the time of its incorporation through December 31, 1964: ANDREW TELL("Esther'sCorporation")Shares heldDecember 31Stockholders3-1-58195919601961196219631964Andrew Tell5,1505,3905,3905,3902,1002,0002,000Mary Tell5,1505,3905,3905,3902,1252,0252,025Esther Rhodes1,0001,0001,0001,0002,5002,7002,750Benny Rhodes50505050250250700Marilyn Hamman505050505050Floyd Hamman505050505050Elisabeth1,2001,2001,2001,2001,2001,200800Senseman (Trust)Paul Senseman2525Lydia (Tell)1,2001,2001,2001,2001,2001,2001,200Lewis (Trust)Robert Weaver1111James Smith1111Treasury Stock2227FNB Trust 11,0001,0001,00090402 E. RhodesFNB Trust 11,0001,0001,00090403 M. HammanFNB Trust 11,0001,0001,00090404 E.SensemanFNB Trust 11,0001,0001,00090405 L. LewisFNB Trust 11,0001,0001,00090406 E. RhodesFNB Trust 11,0001,0001,00090407 M. HammanFNB Trust 11,0001,0001,00090408 E.SensemanFNB Trust 11,0001,0001,00090409 L. LewisTotal Stock13,85214,33214,33214,33217,50217,50217,502*243 *244 MARY TELL("Marilyn'sCorporation")Shares heldDecember 31Stockholders3-1-58195919601961Andrew Tell2,5002,5502,5506,250Mary Tell2,5002,5502,5506,250Esther Rhodes50505050Benny Rhodes50505050Marilyn Hamman1,0001,0001,0001,000Floyd Hamman50505050Elisabeth Senseman (Trust)1,5001,5001,5001,500Paul SensemanLydia (Tell) Lewis (Trust)1,5001,5001,5001,500Robert Weaver1111James Smith1111Treasury StockFNB Trust 1 90402 E. RhodesFNB Trust 1 90403 M. HammanFNB Trust 1 90404 E. SensemanFNB Trust 1 90405 L. LewisFNB Trust 1 90406 E. RhodesFNB Trust 1 90407 M. HammanFNB Trust 1 90408 E. SensemanFNB Trust 1 90409 L. LewisTotal Shares9,1529,2529,25216,652Stockholders196219631964Andrew Tell3,7253,6253,625Mary Tell3,7503,6503,650Esther Rhodes5050Benny Rhodes5050Marilyn Hamman1,0001,2001,250Floyd Hamman5050100Elisabeth Senseman (Trust)1,5001,5001,500Paul Senseman2525Lydia (Tell) Lewis (Trust)1,5001,5001,500Robert WeaverJames SmithTreasury Stock2227FNB Trust 1 90402 E. Rhodes1,437 i/21,437 i/21,437 i/2FNB Trust 1 90403 M. Hamman1,437 i/21,437 i/21,437 i/2FNB Trust 1 90404 E. Senseman1,437 i/21,437 i/21,437 i/2FNB Trust 1 90405 L. Lewis1,437 i/21,437 i/21,437 i/2FNB Trust 1 90406 E. Rhodes1,437 i/21,437 i/21,437 i/2FNB Trust 1 90407 M. Hamman1,437 i/21,437 i/21,437 i/2FNB Trust 1 90408 E. Senseman1,437 i/21,437 i/21,437 i/2FNB Trust 1 90409 L. Lewis1,437 1/21,437 1/21,437 1/Total Shares23,15223,15223,152*245 AMBEL("Elisabeth'sCorporation")Shares heldDecember 31Stockholders9-11-58195919601961196219631964Andrew Tell1,2501,2501,2502,2502,1502,1501,950Mary Tell1,2501,2501,2502,2502,1502,1501,850Elisabeth Senseman1,0001,0001,0001,0001,2001,7001,900Paul Senseman252525525625Lydia (Tell) Lewis1,0001,0001,0001,0001,000Grandchildren's200Trusts (SensemanChildren)Robert Weaver1111200Treasury Stock111Total Shares4,5014,5014,5266,5266,5266,5266,526INVESTMENTS("Lydia'sCorporation")Shares heldDecember 31Stockholders9-24-57195919601961196219631964James & Alva Rae500Andrew Tell2507507507504,3004,1004,100Mary Tell2507507507504,3004,1004,100Elisabeth Senseman200200200200200Paul Senseman2502525Lydia (Tell) Lewis200200200200600825Robert Weaver1111Treasury Stock50050050011Total Shares1,0002,4012,4012,6519,0269,0269,026*246 555 LAND("Grandchildren'sCorporation")shares heldDecember 31Stockholders3-1-58195919601961196219631964Andrew Tell7,0007,0007,4005,90010,6508,4505,375Mary Tell7,0007,0007,4005,60010,6508,4505,400Esther Rhodes1,0001,0001,0001,0001,0001,0001,000Benny Rhodes50505050505050Marilyn Hamman1,0001,0001,0001,0001,0001,0001,000Floyd Hamman50505050505050Elisabeth500500500500500500500SensemanPaul Senseman25Lydia (Tell)500500500500500500500LewisGrandchildren's2,7005,7005,70010,10016,200TrustsRobert Weaver111111James Smith111111Treasury Stock2Total Shares17,10217,10220,60220,30230,10230,10230,102CONSTRUCTIONshares heldDecember 31Stockholders2-21-58195919601961196219631964Andrew Tell850850850850850830830Mary Tell850850850850850800800Esther Rhodes50505050505050Benny B. Rhodes50505050505050Marilyn Hamman50505050505050Floyd Hamman50505050505050Elisabeth Senseman50505050505050Paul Senseman707070Lydia (Tell) Lewis50505050505050Robert Weaver11111James A. Smith11111Treasury Stock22Total Shares2,0022,0022,0022,0022,0022,0022,002*247 The financial statement submitted by Tell on or about December 31, 1964 to lenders to induce them to loan money to Tell personally or to one of the petitioner corporations indicated that he owned a majority of the voting stock of all the petitioner corporations, as shown in the following schedule: Total SharesShares OwnedPetitionerin 1964by TellAndrew Tell *17,50212,025Mary Tell *23,15218,775Ambel6,5264,300Investments9,0268,200Land **30,10210,775Construction2,0021,680Rental properties were transferred to Andrew Tell, Mary Tell and Ambel upon incorporation. Investments also acquired a number of completed buildings which were transferred to it subject to lease. Substantially all of such rental properties were sold during the taxable years before us. Subsequently*248 each of these corporations acquired additional rental properties in the following manner. A prospective tenant would contact Tell evincing an interest in having a building constructed for lease to him. Tell would determine which of the corporations - Andrew Tell, Mary Tell, Ambel or Investments - was to have the tenant's business. A building site would be acquired. Usually an improved lot in an industrial district would be acquired from Tell or a lot or land would be acquired from apetitioner, other than Tell, or, in several instances, from an unrelated person. A lease would be entered into, usually for a lease term of ten years. Tell would secure construction financing on a mortgage, guaranteeing the mortgage in his individual capacity. He would then contract with Construction for construction of the leased facility. A substantial majority of such rental properties have been sold; most, except for those 556 acquired in the later years, being sold during the taxable years before us. All the rental properties of Andrew Tell, Mary Tell, Ambel and Investments were held under a "net lease" wherein the tenant pays the taxes, utility bills, fire and liability insurance premiums, and*249 pays for repairs and maintenance of the building. The lessor is obligated to maintain the structure and roof. As petitioners' buildings were new, there was little upkeep cost to the lessor over the terms of the lease. Rentals were generally calculated on the basis of a ten percent return on the total investment in the leased property, and were usually sufficient to provide a positive cash flow after payment of all expenses incident to a property, including mortgage amortization. Tenants were expected to bring up the subject of a purchase option during their lease negotiations and options were regularly given as an inducement to the making of leases. An option would not be given unless it was asked for by the tenant. The purchase option, contained in a separate instrument, would require six months notice of the tenant's intention to exercise the option. One purpose of the notice requirement was to insure the seller that he would hold the property for at least six months. Neither Tell nor the petitioner corporations are licensed real estate brokers. Nor have they solicited sales of their properties, or given listings to anyone in respect to their properties. Signs have been placed*250 on properties indicating their availability for construction and lease. None of the petitioner corporations have subdivided property. Construction shares offices in the same building with the other petitioner corporations. Construction has two telephone listings which are used by all of the petitioner corporations. Besides its construction employees and Tell, Construction employs a secretary and an accountant. Their salaries are paid by Construction. To the extent they serve the other petitioner corporations, Construction receives reimbursement. Other common expenses of all petitioner corporations paid by Construction, including building expenses and telephone, are allocated to and reimbursed by each of the other petitioner corporations. A single master liability policy insures Construction, the other petitioner corporations, Tell, and members of his family. The premium for each insured is computed by the insurance agent and billed to and paid directly by the insured. Corporate records are maintained separately, each of the petitioner corporations having a general ledger, a cash receipts journal and a cash disbursements journal. Separate files are maintained for general corporate*251 papers, buildings and leases. Each corporation maintains individual policies of fire insurance upon properties owned. Corporate meetings of each petitioner corporation were held separately. Only the business of that corporation was discussed. Corporate meetings of petitioner corporations, both stockholders and directors, were well attended. Persons attending corporate meetings were encouraged to participate and Tell, in particular, encouraged the participation of his daughters. Petitioners disposed of the following properties during their respective taxable years, realizing the indicated gains: THE TELLSDecriptionYearGainLot 57, Rae Industrial Dis- trict1961$ 11,745.91Corner Lot, Payne Industrial District13,234.27Quality Building, Hadsell Ad- dition7,483.98Part Lot 23, Hadsell Addi- tion4,292.25Part Tract N, Payne Indus- trial District23,928.21Part Tract C, Grand Indus- trial District5,000.00Part Lot 23, Hadsell Addi- tion5,953.32Lot 68, Rae Industrial District Part Tract3,070.75N, Payne Indus- trial District* $ 76,495.39Gross Building1961$ 756.17Charmen Building, Rae In- dustrial1962$ 2,615.75Lot 23, Rae Industrial Dis- trict3,500.00Part Lot 23, Hadsell Addi- tion(129.15)Arizona Syrup Building, Rae Industrial932.43Ray Barb Kennels, Rae In- dustrial624.22Part of Lot 63, Rae Indus- trial5,927.00Lots 74, 75, Rae Industrial4,883.61Robbins Nest Nursery8,663.43$ 27,017.29Lot 36, Rae Industrial1963$ 578.34Part Section 27, T2N, R2E4,000.00$ 4,578.34Fed-Mart Building, Grand In- dustrial1964$290,254.51*252 ANDREW TELLDescriptionYearGainMaster Metal Finish Building1961$ 7,765.83Ebco Building24,452.82Brewer Land (Reickoff)1,736.59Burdett Land651.72$ 34,606.96Brewer Land (Tell Founda- tion)1962$ 1,568.48Mortuary Building68,936.10U-Totem Building8,420.89Milgram Building2,010.12Hicks Building4,194.36Formette Building19,450.99Lot 16, Collins Addition668.90$105,249.84Beacon Restaurant (short term)1963$ 830.27Brewer Land (Phoenix Trust)1,302.67Baby Formula Building7,753.79Natural Rock Building7,597.12Lot 17, Collins Addition250.00Part Tract C, Grand Indus- trial2,582.27$ 20,316.12Part Section 27, T2N, R2E1964$ 3,918.28Burdett Land8,153.65Ornamental Iron Building18,687.68Restaurant Building11,917.67Collier Building1,281.88$ 43,959.16MARY TELLSouthwest Metals Building1961$ 29,741.56Part Lot 26, Grand Industrial1,486.56$ 31,228.12Furniture Lines Building1962$ 5,768.69Engine Power Building13,565.80Pacific Guano Building10,259.03L.C.S. Building13,164.11Ari-Togs Building52,080.60Lot 52, Rae Industrial2,157.21$ 96,995.44Pacioni Restaurant (short term)1963$ (72.86)Cody Building2,608.84Snow Cap Building(201.85)Maryvale Post Office6,329.70Lot 63, Rae Industrial8,069.99San Clemente Estates41,485.08Wills Building8,425.90$ 66,644.80Loftin Building1964$ 51,128.40Wilmar Building3,381.62Furniture Mart Building36,296.47Lot 58, Rae Industrial1,694.39$ 92,500.88AMBELAbert Building1961$ 5,866.96Precise Metals Building1962$ 19,985.60Ability Metals Building32,993.88Capital Auto #16,547.21Capital Auto #2 (short term)869.13Raichert Building4,493.24Winburne Land3,206.72Winburne Land$ 1,919.88Augustin Building11,278.21Bayer Building5,094.54$ 86,388.41Reliable Dry Wall Building1963$ 2,893.54Sales Service Engineering Building3,594.58Sanckmobile Building8,866.80Twentieth Century Building29,168.95Hargrove Land4,490.04Automotive Sales Building22,830.15$ 71,844.06Beach Building1964$ 3,087.85Winburne Land3,042.24Winbune Land2,189.14Scott Fastener Building5,676.40$ 13,995.63INVESTMENTSAdvance Building7,011.35Van Valkenburgh Building9,713.13$ 17,480.65Lorts Building1962$ 903.41Publice Building3,987.20Foley Building210.00$ 5,100.61None1963No gainEvans Nursery Building1964$ 7,086.59LANDYork Lift Building1962$ 10,650.94Deer Valley Land4,968.25$ 15,619.19Midway Land1963$ 4,272.29Arizona City Building16,411.35Camelback Citrus Grove90.48$ 20,774.12Midway Land1964$ 5,893.48Midway Land8,097.05$ 13,990.53Moss Land1965$ 9,427.92Wildman Land3,846.42Stillion Land4,619.33Stillion Land6,079.38Midway Land5,658.80Tidwell Building9,071.79$ 38,703.64CONSTRUCTIONOrange Julius Building1964$ 9,036.52Ga Po Building1,462.34$ 10,498.86*253 The following schedules set forth certain income and expense information for each of the petitioner corporations for the indicated taxable years: (These tables are copied from Exhibits admitted into evidence. They contain unexplained mathematical errors.) 558 ANDREW TELLTaxable Period9/30/589/30/599/30/609/30/61Income:Gross Rents$31,412.50$ 61,985.00$63,242.67$ 66,032.98Interest175.001,137.392,118.82655.00Gain from sale of assets848.4860,988.2423,041.6534,606.96Other956.75216.11521.42--Total Income33,392.73124,326.7488,924.56101,294.94Expense:General Expense9,412.7625,657.9428,418.4049,339.53Depreciation8,065.6716,215.4518,302.3918,429.15Total Expense17,478.4341,873.3946,720.7967,768.68Net Taxable Income15,914.3082,453.3542,203.7733,526.26Net Income or (Loss) without15,065.8221,465.1119,162.12(1,080.70)gain from sale of assetsDividends Paid------14,332.00Income Tax Paid - Federal4,774.2921,686.5911,509.058,651.74Non-recurring or Non- rentitems:Contributions836.114,339.642,221.055,460.61Abandonment Losses----2,150.003,853.754,371.059,314.36*254 ANDREW TELLTaxable Period9/30/629/30/639/30/64Income:Gross Rents$ 74,435.55$ 82,679.36$ 85,625.54Interest226.751,964.175,759.75Gain from sale of assets105,249.8420,316.1213,650.70Other351.74187.20698.30Total Income180,263.88105,146.85135,734.29Expense:General Expense51,812.6252,129.8645,448.41Depreciation24,739.4729,480.8826,330.63Total Expense76,552.0981,610.7471,779.04Net Taxable Income103,711.7923,536.1163,955.25Net Income or (Loss) without(1,538.05)3,219.9920,304.55gain from sale of assetsDividends Paid14,332.0043,750.0035,000.00Income Tax Paid - Federal26,312.466,086.5416,696.56Non-recurring or Non- rentitems:Contributions1,764.531,247.123,366.07Abandonment Losses14,619.75----16,384.28MARY TELLTaxable Period9/30/589/30/599/30/609/30/61Income:Gross Rents$28,375.00$50,220.17$52,013.73$ 62,543.73Interest233.31540.79742.492,116.98Gain from sale of assets8,582.2543,251.4920,397.5840,443.58Miscellaneous Refunds146.98--491.41--Total Income37,337.5494,012.4573,645.21105,104.29Expense:General Expense9,163.9818,572.7818,727.8527,756.12Depreciation7,517.2812,126.5812,669.8918,318.80Total Expense16,681.2630,699.3631,397.7446,074.92Net Taxable Income20,656.2863,313.0942,247.4759,029.37Net Income or (Loss) without12,074.0320,061.6021,849.8918,585.79gain from sale of assetsDividends Paid------9,252.00Income Tax Paid - Federal5,767.7616,831.3511,654.3615,686.63Non-recurring or Non- rentitems:Contributions1,000.003,332.272,223.553,106.81Abandonment Losses--366.13----3,698.40*255 MARY TELLTaxable Period9/30/629/30/639/30/64Income:Gross Rents$ 72,672.65$ 76,874.16$ 64,987.19Interest2,634.723,037.454,653.86Gain from sale of assets105,474.80* 66,644.8092,500.88Miscellaneous Refunds------Total Income180,782.17146,556.41162,141.93Expense:General Expense43,206.7747,796.1544,931.16Depreciation23,225.6224,122.0420,465.85Total Expense66,432.3971,918.1965,397.01Net Taxable Income114,349.7874,638.2296,744.92Net Income or (Loss) without8,874.987,993.424,244.04gain from sale of assetsDividends Paid16,652.0057,875.0046,300.00Income Tax Paid - Federal29,031.209,280.4624,334.54Non-recurring or Non- rentitems:Contributions6,018.411,849.495,091.83Abandonment Losses------ 559 AMBELTaxable Period12/31/5812/31/5912/31/6012/31/61Income:Gross Rents$17,427.70$33,417.50$33,135.50$34,415.00Interest----99.4715.00Gain from sale of assets--13,357.2324,634.285,866.96Other--125.0026.84--Total Income17,427.7046,899.7357,896.0940,296,96Expense:General Expenses2,139.3214,699.7320,336.8520,375.41Depreciation1,199.2411,089.1912,024.9211,679.88Total Expense3,338.5625,788.9232,361.7732,055.29Net Taxable Income14,089.1421,110.8125,534.328,241.67Net Income or (Loss) without gain14,089.147,753.58900.042,374.71from sale of assetsDividends Paid--------Income Tax Paid - Federal4,226.745,929.966,428.582,179.15Non-recurring or Non- rent items:Contributions741.531,111.091,343.92433.77Abandonment Losses----3,250.003,001.254,593.923,435.02*256 AMBELTaxable Period12/31/6212/31/6312/31/64Income:Gross Rents$ 33,110.00$ 14,082.50$ 35,125.00Interest608.396,240.542,650.72Gain from sale of assets86,388.4171,844.06* 13,995.63Other12.00----Total Income120,118.8092,167.1051,771.35Expense:General Expenses32,836.1624,124.0523,800.09Depreciation10,454.017,557.1210,773.44Total Expense43,290.1731,681.1737,573.53Net Taxable Income76,828.6360,485.9314,197.82Net Income or (Loss) without gain(9,559.78)(11,358.13)202.19from sale of assetsDividends Paid--6,525.0013,050.00Income Tax Paid - Federal21,379.8217,961.022,136.42Non-recurring or Non- rent items:Contributions4,043.613,183.47448.49Abandonment Losses7,791.25----11,834.86INVESTMENTSTaxable Period9/30/589/30/599/30/609/30/61Income:Gross Rents$18,372.50$21,830.00$12,925.00$25,667.39Interest----6.00--Gain from sale of assets5,018.9519,897.8116,524.6866,414.53Miscellaneous Refunds--511.41--40.68Total Income23,391.4542,239.2229,455.6892,122.60Expense:General Expenses8,574.7410,904.7016,197.4017,329.54Depreciation4,917.035,620.895,040.039,287.46Total Expense13,491.7716,525.5921,237.4326,617.00Net Taxable Income9,899.6825,713.638,218.2565,505.60Net Income or (Loss) without gain4,880.735,815.82(8,306.43)(908.93)from sale of assetsDividends Paid--------Income Tax Paid - Federal2,718.966,719.192,465.4716,603.63Non-recurring or Non- rent items:Contributions--1,353.35432.543,447.66Abandonment Losses--------*257 INVESTMENTSTaxable Period9/30/629/30/639/30/64Income:Gross Rents$38,030.37$46,451.21$47,096.80Interest------Gain from sale of assets5,100.61--7,086.59Miscellaneous Refunds67.39--37.14Total Income43,198.3746,451.2154,220.53Expense:General Expenses24,106.4224,966.0127,725.90Depreciation15,729.9319,577.5018,796.25Total Expense39,836.3544,543.5146,522.15Net Taxable Income3,362.021,907.707,698.38Net Income or (Loss) without gain(1,738.59)1,907.70611.79from sale of assetsDividends Paid------Income Tax Paid - Federal1,008.61572.311,943.48Non-recurring or Non- rent items:Contributions176.95100.41405.19Abandonment Losses------ 560 LANDTaxable Period3/31/583/31/593/31/603/31/61Income:Gross Rents$815.00$8,475.00$13,920.00$17,589.68Interest99.98965.70395.86--Gain from sale of assets----21,994.98--Miscellaneous Refunds--85.00--21.68Total Income914.989,525.7036,310.8417,611.36Expense:General Expense370.075,385.879,500.3323,002.38Depreciation194.242,636.874,813.914,336.36Total Expense564.318,022.7414,314.2427,338.74Net Taxable Income or (Loss)350.671,502.9621,996.60(9,727.38)Net Income or (Loss) without gain350.671,502.961.62(9,727.38)from sale of assetsDividends Paid--------Income Tax Paid - Federal105.20450.895,499.24NoneCarried back 1961 Loss and(105.20)(450.89)(1,262.38)--received refund as followsNon-recurring or Non- rent items:Contributions--79.1059.28--Abandonment Losses--------*258 LANDTaxable Period3/31/623/31/633/31/64Income:Gross Rents$21,200.00$28,666.70$25,250.00Interest125.39772.36901.01Gain from sale of assets15,619.1920,774.1213,990.53Miscellaneous Refunds321.101,744.102,183.96Total Income37,265.6851,957.2842,325.50Expense:General Expense31,011.9443,191.3839,899.77Depreciation4,569.685,960.322,327.37Total Expense35,581.6249,151.7042,227.14Net Taxable Income or (Loss)1,684.062,805.5898.36Net Income or (Loss) without gain(13,935.13)(17,968.54)(13,892.17)from sale of assetsDividends Paid------Income Tax Paid - Federal505.22841.6727.01Carried back 1961 Loss and------received refund as followsNon-recurring or Non- rent items:Contributions88.64147.66--Abandonment Losses5,042.06----5,130.70CONSTRUCTIONTaxable Period6/30/586/30/596/30/606/30/61Income:Construction Income$46,713.34$879,359.93$1,154,116.57$719,467.86Less Cost of Jobs40,738.39820,754.551,101,431.79658,443.53Gross Profit5,974.9558,605.3852,684.7861,024.33Rental Income2,030.888,008.348,360.008,672.87Miscellaneous Re- funds &233.08789.041,876.662,188.85InterestGain from sales of assets--------Total Income8,238.9167,402.7662,921.4471,886.05Expenses:Officers Salaries - Andrew1,700.005,200.005,200.005,200.00P. TellOffice and General1,202.0011,600.3611,864.6213,403.65SalariesGeneral Expense2,981.5122,295.4530,559.0928,594.30Depreciation Expense720.363,045.884,181.323,967.99Total Expense6,603.8742,131.6951,805.0351,165.94Net Taxable Income1,635.0425,261.0711,116.4120,720.11Dividends Paid--------Income Tax Paid - Federal490.517,635.753,334.926,216.03*259 CONSTRUCTIONTaxable Period6/30/626/30/636/30/64Income:Construction Income$1,126,879.96$556,963.11$311,310.76Less Cost of Jobs1,085,778.45508,757.71279,807.76Gross Profit41,101.5148,205.4031,503.00Rental Income10,515.818,220.005,728.00Miscellaneous Re- funds &956.601,753.571,771.71InterestGain from sales of assets----11,365.42 *Total Income52,573.9258,178.9750,368.13Expenses:Officers Salaries - Andrew5,200.005,200.005,200.00P. TellOffice and General9,963.5012,947.459,626.54SalariesGeneral Expense30,759.7224,669.7923,363.77Depreciation Expense3,560.043,235.621,057.02Total Expense49,483.2646,052.8639,247.33Net Taxable Income3,090.6612,126.1111,120.80Dividends Paid----4,000.00Income Tax Paid - Federal927.203,637.832,974.84 561 During their taxable years 1961, 1962, 1963, and 1964, the Tells made the following sales of property held for more than six months, the gain from which the Commissioner has determined to be taxable as ordinary income rather than as capital gain*260 as reported on their joint returns. 1961 Lot 57, Rae Industrial District, Unit 3 On January 2, 1961, the Tells sold lot 57, Rae Industrial District, Unit 3, to Phillips 66, Inc. for $20,000, at a gain of $11,745.91. This lot was acquired as part of acreage distributed to Tell upon the dissolution of Tell-Rae partnership in 1958. The land was subsequently subdivided by Tell as Rae Industrial District, Unit Three. Ultimate Finding Lot 57, Rae Industrial District, Unit 3 was held by the Tells primarily for sale to customers in the ordinary course of their trade or business. Corner of 35th Avenue and Osborne, Payne Industrial District On January 10, 1961, the Tells sold this lot to Phillips 66, Inc. for $20,000 at a gain of $13,234.27. This lot was part of land acquired in 1955 and subdivided as Payne Industrial District. Ultimate Finding The corner of 35th Avenue and Osborne, Payne Industrial District was held by the Tells primarily for sale to customers in the ordinary course of their trade or business. Quality Building On September 9, 1954, the Tells acquired land in Hadsell Addition. In early 1960, the Tells leased part of lot 23, Hadsell Addition and a*261 building to be constructed thereon to Quality Building for ten years granting the tenant an option to purchase the building within three years of completion. The building was completed on June 1, 1960. The Tells sold the lot to Oscar Melgard, et al., on February 3, 1961 at a gain of $7,483.98. Ultimate Finding The Quality Building was held by the Tells primarily for sale to customers in the ordinary course of their trade or business. Part of Lot 23, Hadsell Addition On February 28, 1961, the Tells sold additional land in lot 23, Hadsell Addition to Oscar Melgard, et al., (see Quality Building, supra) at a gain of $4,292.25. Ultimate Finding Part of lot 23, Hadsell Addition, was held by the Tells primarily for sale to customers in the ordinary course of their trade or business. Part of Tract N, Payne Industrial District On March 31, 1961 the Tells sold ten acres in Payne Industrial District to Alhambra School District No. 68 for $47,500, at a gain of $23,928.21. Ultimate Finding Part of Tract N, Payne Industrial District was held by the Tells primarily for sale to customers in the ordinary course of their trade or business. Part of Tract C, Grand Industrial*262 District On May 4, 1961, the Tells sold part of Tract C, Grand Industrial District to Andrew Tell for $7,300 at a gain of $5,000. Ultimate Finding This parcel was held by the Tells primarily for sale to customers in the ordinary course of their trade or business. Part of Lot 23, Hadsell Addition On August 1, 1961, the Tells sold additional land out of lot 23, Hadsell Addition to Walter Phillips for $6,500 at a gain of $5,953.32. (See Quality Building, supra.) Ultimate Finding Part of lot 23, Hadsell Addition, was held by the Tells primarily for sale to customers in the ordinary course of their trade or business. Lot 68, Rae Industrial District On October 9, 1961, the Tells sold lot 68, Rae Industrial District to Mary Tell for $5,000 at a gain of $1,786.70. Ultimate Finding Lot 68, Rae Industrial District was held by the Tells primarily for sale to customers in the ordinary course of their trade or business. 562 Part of Tract N, Payne Industrial District On November 31, 1961 the Tells sold part of Tract N, Payne Industrial District to M. and B. Milan for $5,000, at a gain of $3,070.75. Ultimate Finding Part of Tract N, Payne Industrial District*263 was held by the Tells primarily for sale to customers in the ordinary course of their trade or business. 1962 Charmen Building On February 28, 1961, the Tells leased to Charmen Metal Products ("Charmen") part of lot 70, Rae Industrial District Unit Three and a building to be constructed thereon, for five years from the date of completion and acceptance of the building. On March 3, 1961 the Tells granted Charmen an option to purchase the land and building for $17,500 exercisable within three years of completion of the building. On February 22, 1961 Tell contracted with Construction for construction of the building for $8,000. The building was completed April 1, 1961 at a cost of $6,228.03. Tell signed the construction contract for both parties. On January 11, 1962, the Tells sold the building to R.R. and B. Weaver for $10,822.50 at a gain of $2,615.75. During the eight months they held the building, the Tells received $1,750 rent and claimed $369.45 depreciation. Ultimate Finding The Charmen Building was held by the Tells primarily for sale to customers in the ordinary course of their trade or business. Lot 23, Rae Industrial District On January 11, 1962 the Tells sold*264 lot 23, Rae Industrial District to W. and M. Halladay for $6,500 at a gain of $3,500. Lot 23, originally part of Rae Industrial District acquired by the Tells through a real estate trust was sold directly from the trust on November 13, 1957 and reacquired by the Tells, on December 13, 1961, from R. and B. Weaver. Ultimate Finding Lot 23, Rae Industrial District was held by the Tells primarily for sale to customers in the ordinary course of their trade or business. Part of Lot 23, Hadsell Addition On January 29, 1962 the Tells sold part of lot 23, Hadsell Addition to First National Bank, Trustee. A building on this parcel completed May 31, 1961, was under a five-year lease. The parcel was sold at a loss of $129.15. Ultimate Finding This parcel was held by the Tells primarily for sale to customers in the ordinary course of their trade or business. Arizona Syrup Building On January 19, 1960 the Tells sold lot 54, Rae Industrial District, to C. and R. Desman for $5,000. The Tells reacquired the lot from the Desmans on that same day. On October 6, 1960 the Tells leased the land and a building to be constructed thereon to L. and N. Marsh and J. and L. Fromchuck for ten*265 years from the date of completion and acceptance of the building, granting them an option to purchase the land and building for $32,000 within three years from completion of the building. On November 9, 1960 Tell contracted with Construction for construction of the building for $20,000. The building was completed February 1, 1961 at a cost of $16,840.42. Tell signed the construction contract for both parties. On February 5, 1962 the Tells sold the land and building to First National Bank as Trustee for $25,825 at a gain of $932.43. During the period the building was held the Tells received $3,420 rent and took $1,234.52 depreciation. Ultimate Finding The Arizona Syrup Building was held by the Tells primarily for sale to customers in the ordinary course of their trade or business. Ray Barb Kennels On June 17, 1961 the Tells leased part of lot 70, Rae Industrial District, Unit Three, and a building to be constructed thereon to C. and B. Eggleston for ten years from the date of completion and acceptance of the building, granting an option to purchase the building for $25,000 within three years from completion of the building. On June 12, 1961, Tell contracted with Construction*266 for construction of the building for $18,600. The building was completed in September 1961 at a cost of $19,008.26. Tell signed the construction contract for both parties. On February 5, 1962 the Tells sold Ray 563 Barb Kennels to First National Bank as Trustee for $20,675 at a gain of $624.22. During the six months the building was held, the Tells received $1,125 rent and claimed $472 depreciation. Ultimate Finding The Ray Barb Kennels were held by the Tells primarily for sale to customers in the ordinary course of their trade or business. Part of Lot 63, Rae Industrial District, Unit Three On March 8, 1962 the Tells sold part of lot 63, Rae Industrial District, Unit Three, acquired February 6, 1959, to A. D. Williamson for $7,500 at a gain of $5,927. Ultimate Finding Part of lot 63, Rae Industrial District, Unit Three, was held by the Tells primarily for sale to customers in the ordinary course of their trade or business. Lots 74 and 75, Rae Industrial District On April 25, 1962, the Tells sold lots 74 and 75, Rae Industrial District, acquired July 30, 1957, to H. and F. Shipley for $9,000 at a gain of $4,883.61. Ultimate Finding Lots 74 and 75, Rae Industrial*267 District were held by the Tells primarily for sale to customers in the ordinary course of their trade or business. Robbins Nest Nursery On November 15, 1960 the Tells leased part of section 27, T2N, R2E, acquired June 30, 1955, and a building to be constructed thereon the Robbins Nest Nursery, to M. and B. Milan for five years from the date of completion and acceptance of the building, granting the Milans an option $26,000 within three years from date of completion of the building. On November 15, 1960, Tell contracted with Construction for construction of the building for $15,000. The building was completed in February 1961 at a cost of $15,436. Tell signed the construction contract for both parties. On March 20, 1962, the Tells sold Robbins Nest Nursery to Solomon and V. Doubchan for $25,130 at a gain of $8,663.43. During the period they held the building, the Tells received $3,780 rent and claimed $1,002.18 depreciation. Ultimate Finding The Robbins Nest Nursery was held by the Tells primarily for sale to customers in the ordinary course of their trade or business. 1963 Lot 36, Rae Industrial District, Unit Two On January 28, 1963, the Tells sold lot 36, Rae Industrial*268 District, Unit Two, acquired July 30, 1957, to the Tell Foundation for $4,578.34 at a gain of $578.34. Ultimate Finding Lot 36, Rae Industrial District, Unit Two, was held by the Tells primarily for sale to customers in the ordinary course of their trade or business. Part of Section 27, T2N, R2E On October 18, 1963, the Tells sold section 27, T2N, R2E, acquired June 30, 1955, to Ambel for $8,578.34 at a gain of $4,000. Ultimate Finding This parcel was held by the Tells primarily for sale to customers in the ordinary course of their trade or business. 1964 Fed-Mart Building, Lots 1 and 2, and Part of Tract A, Grand Industrial District In the mid 1950's Loma Supply Corporation (later renamed the Fed-Mart Corporation) operated a discount store in San Diego and desired a Phoenix location. The Loma Supply Corporation people liked the Grand Avenue location of Tell and, after a period of negotiation, on May 29, 1956, Sol Price, an attorney acting for Loma Supply Corporation, tendered Tell $100 for a thirty-day option which option Tell granted May 31, 1956, as optionor, providing for (i) Tell personally to construct, if his bid was within 2 percent of the lowest bids*269 received when the contract was let for bid, or cause to be constructed, a 25,000 square foot building on lots 1 and 2, plus the South 6 i/2 acres of Tract A, Grand Industrial District (approximately 10 acres in all); (ii) a 15-year lease at a rental of 8 percent net on the building, improvements and land (the lessee to pay all taxes, insurance and maintenance costs); (iii) an option to purchase, by separate instrument, exercisable after six months and within five years of commencement of the lease 564 term for a price of $250,000; and (iv) an escalation of rent should Tell be unable to secure institutional financing for 15 years at 5 percent or less, the escalation to be the difference between 5 percent and the rate of interest paid. The option to purchase was required by representatives of the Loma Supply Corporation in order that the corporation, should its business in Phoenix prosper, might have an opportunity to acquire the building. Loma Supply Corporation exercised the option to lease and on August 1, 1956, a 15-year net lease, providing a monthly rental of $2,000, was entered into between the Tells and Loma Supply Corporation of Arizona (later renamed Fed-Mart of Phoenix, *270 Inc.) ("Fed-Mart") for the land and a building to be constructed. By a separate instrument dated the same date, Tell granted an option to purchase for $290,000, not exercisable prior to July 1, 1957 nor after June 30, 1962. In October of 1956, a small warehouse building was added to the Fed-Mart complex, the rental increased to $2,075 and the option, by separate instrument, increased to $300,000. On April 1, 1957, the lease was again supplemented, because of a building addition of approximately 8,400 square feet, and the monthly rental increased to $2,300, and the option to purchase increased to $328,000. Neither the lease term nor the period in which the option could be exercised were extended. On March 27, 1958, the lease was again supplemented because of an addition of approximately 28,000 square feet and the monthly rental increased to $3,800. On May 23, 1958, by separate instrument, the option was supplemented to provide a purchase price of $528,000. The lease term was not extended by the supplement to lease, but the supplement to option extended the time in which the property could be acquired to June 30, 1963. On February 8, 1962, the lease was again supplemented to*271 cover an additional building (a 24 by 120 addition) and the monthly rental increased to $4,000. On the same date, by separate agreement, the option was supplemented to increase the option price to $548,000. Neither the lease term nor the option period were extended. Mortgage funds were acquired from the Great Southern Life Insurance Company and mortgage amortization (principal and interest) of the initial loan of $150,000 was $1,225.50 monthly; and, on the increased mortgage loan, in the amount of $265,000 to finance the improvements covered by the Second Supplemental Lease Agreement, monthly amortization (principal and interest) was $2,165.05. Monthly rental income on the Fed-Mart Building was $2,000 and $3,800 respectively at the time these loans were consummated. Fed-Mart exercised the option to purchase and, on May 10, 1963, an escrow was established with Phoenix Title and Trust Company, the escrow to close June 30, 1963. Discussions between Tell and representatives of Fed-Mart resulted in an extension of the closing date to January 2, 1964, the initial closing date of June 30, 1963, having been selected by Fed-Mart to insure exercise of the option was within the period specified*272 in the Second Supplemental Option to Purchase. The extension was mutually advantageous: Fed-Mart was permitted additional time to arrange financing; Tell received rent for an additional six-month period and a full year's depreciation on the building. As Tell was to receive rent for an additional period, he agreed to reduce the selling price of the building by $8,000 or from $548,000 to $540,000. The escrow did not close until January 14, 1964, and Tell received, in addition to $4,000 per month from July 1 through December 31, 1964, rent in the amount of $133.33 daily for the period January 1 through January 14, 1964. The interest cost to Tell approximated $29.52 daily on the Great Southern obligation and the net cash flow to Tell during the period the closing date of the escrow was extended approximated $104 daily; in consideration of this net cash flow Tell reduced the sales price on closing January 14, 1964 by $8,000. The payoff figure on the mortgage to Great Southern was $193,220.24 and Tell received net proceeds from escrow of $325,433.41. During the period the Tells held the Fed-Mart Building, they received $306,200 rent and claimed $96,412.61 depreciation. They realized*273 a gain on its sale of $209,254.51. Ultimate Finding The Fed-Mart Building, lots 1 and 2, and part of Tract A, Grand Industrial District were held by the Tells primarily for sale 565 to customers in the ordinary course of their trade or business. Installment Collections On their joint returns for the taxable years 1961, 1962, 1963 and 1964, the Tells reported as long-term capital gains the following amounts realized upon collections from installment sales of real property held for more than six months: Year of Sale andGain Realized inDescriptionTaxable Year19611962196319641956Lot 29, Grand Industrial$142.27$150.80$2,064.60DistrictLot 30, Grand Industrial143.43152.03161.16$170.83DistrictLot 31, 32, and 33, Grand681.496,698.76Industrial District1957Gray78.90985.101959Land-Rae Industrial District3,943.40Land-Central Industrial4,002.41District1960Lot 66, Rae Industrial148.73173.07183.67196.42DistrictLot 65, Rae Industrial163.48190.33202.072,053.94DistrictGrunwald Building21,524.5431,038.92Land, Grand Industrial25,663.754,190.24District*274 Ultimate Finding All of the above-described properties were held by the Tells primarily for sale to customers in the ordinary course of their trade or business. Lincoln Partnership On their 1963 and 1964 joint returns the Tells reported the amounts of $6,084.44 and $29,335.35, respectively, as their share of net long-term gain from the Lincoln Partnership. In 1963 Tell was individually approached to buy a group of rental properties located on 3rd Street and Lincoln, Phoenix, then vacant because the tenant, Momson, Dunagan and Ryan Plumbing, had departed Phoenix for El Paso, Texas. Tell envisioned great possibilities for the building and wished to give his sons-in-law an opportunity to participate in a profitable venture, the leasing of the building. Tell called his three sons-in-law, Benny Rhodes, Floyd Hamman and Paul Senseman together, and the three of them, with Tell, viewed the property. The boys were impressed and the Lincoln partnership was formed to purchase the building. The capital contribution of each son-in-law was $25,000 and that of Tell was $40,000. After its acquisition the building was rented by the partnership. Paul Senseman became in need of funds for*275 the construction of a new home and for stock purchased in Ambel, and desired money from the partnership. The partners decided to sell the Lincoln property to Ambel. On September 8, 1963, the partnership sold part of the property, a warehouse and shed, leased to the United States Government, to Ambel for $70,000 at a gain of $17,433.95 after allowance of $1,019.67 depreciation. On January 16, 1964, the partnership sold the remainder of the property to Ambel for $150,000 at a gain of $84,055.45 after allowance of $3,346.45. Ambel still holds the Lincoln properties. Ultimate Finding The Lincoln Partnership property was not held primarily for sale to customers in the ordinary course of the partnership's trade or business. During its taxable years ended September 30, 1961, 1962, 1963, and 1964, Andrew Tell made the following sales of property held for more than six months, the gain from which the Commissioner has determined to be taxable as ordinary income rather than as capital gain as reported on Andrew Tell's returns. 1961 Master Metal Finish Building On May 2, 1959, Andrew Tell acquired by purchase lots 16, 17, 18, 19, Block 52, Collins Addition, from Land. On May 19, 1959 Andrew*276 Tell leased lot 19 and a building to be constructed thereon to Rudolf Mastaler, doing business as Master Plating & Metal Finishing, for ten years at a monthly rental of $140. On August 566 19, 1959 Andrew Tell contracted with Construction for construction of the building at a cost of $6,000. On February 2, 1960 Andrew Tell entered into a new lease with Mastaler for the lease of the building and an addition to it on lot 18 (to be constructed) for a monthly rental of $275, and granted Mastaler an option to purchase the land and building for $33,000, exercisable within three years of February 20, 1960. In March 1961, the building, subject to the lease and option, was sold to Mr. and Mrs. John A. Slivka, the sister and brother-in-law of Tell. During the period the building was held Andrew Tell received $3,865 rent and claimed $1,252.38 depreciation. The building was sold at a gain of $7,765.83. Ultimate Finding The Master Metal Finish Building was held by Andrew Tell primarily for sale to customers in the ordinary course of its trade or business. Ebco Building On October 31, 1957 the Tells leased lot 26 and E. i/2 lot 27, Payne Industrial District, Unit 2, and a building*277 to be constructed thereon to Ebco Manufacturing for ten years from the date the building was completed and accepted, granting Ebco an option to purchase the land and building for $42,000 within three years of completion of the building. Tell built the building for $20,942.42, completed in January 1958. On March 7, 1958 the Tells transferred the land and building, subject to the lease and option, to Andrew Tell in exchange for stock. On December 2, 1959 Andrew Tell entered into a new lease with the tenant, Arizona Western Manufacturing Corp., for lease of the Ebco Building and an addition to it to be built, and granted Arizona Western an option to purchase the land and building for $60,000 within three years from completion of the addition. On December 8, 1959 Andrew Tell contracted with Construction for construction of the addition for $11,000, extras added $200. The addition was completed in January 1960 at a cost of $10,917. Tell signed the construction contract for both parties. On August 2, 1961, Andrew Tell sold the building to Michael Tell, a brother of Tell, for $56,350, at a gain of $24,452.82. During the period the building was held Andrew Tell received $19,130 rent and claimed*278 depreciation of $5,208.30. Ultimate Finding The Ebco Building was held by Andrew Tell primarily for sale to customers in the ordinary course of its trade or business. Brewer, et al., Land In September 1959 and August 1960, in two purchases Andrew Tell acquired acreage from Brewer, Rosenbaum, Chiapetta and Weinstein. On portions of the land Andrew Tell constructed and leased the Gray, Arizona Tube, and Maricopa Metals Buildings, which it continued to own on September 30, 1964 and the Baby Formula Building which was sold to John Slivka, Jr., Tell's nephew; and the balance of the acreage disposed of as follows: On March 1, 1961, an isolated and usable piece purchased August 31, 1960, was sold to Rieckoff, who desired the land as it was adjacent to property he then owned and on which he was doing business. The Tell Foundation acquired a portion of the land (Pt. Sec. 27, T2N, R25) on October 12, 1961, by purchase and another portion on September 24, 1962, by gift; in December of 1962, a portion of the land was sold to Phoenix Title and Trust Co., as Trustee of Trust No. L30-782, to accommodate the tenant of a building owned by the trust desiring to lease adjacent land; and on*279 December 10, 1962, Phoenix Title and Trust Co., as Trustee of Trust No. L30-782, acquired the balance of the acreage. The parcel sold to Rieckoff, held for six months, was sold for $10,000 at a gain of $1,736.59. Ultimate Finding The parcel sold to Rieckoff was held by Andrew Tell primarily for sale to customers in the ordinary course of its trade or business. Burdett and Cunningham Land On February 23, 1960, land was acquired from Harold and V. Burdett and J. and A. Cunningham. This land was sold, unimproved, in two sales, the first to El Paso Natural Gas (Pt. Sec. 19, TIN, R5E) on August 9, 1961, and the second to Mountain States Telephone and Telegraph (Pt. Sec. 19, TIN, R5E) on August 26, 1964. The 1961 sale to El Paso Natural Gas was at a gain of $651.72. Ultimate Finding Pt. Sec. 19, TIN, R5E was held by Andrew Tell primarily for sale to 567 customers in the ordinary course of its trade or business. 1962 Brewer, et al., Land On October 12, 1962, Andrew Tell sold, unimproved, a portion of property (Pt. Sec. 27, T2N, R2E) acquired from Brewer, Rosenbaum, Chiapetta and Weinstein to the Tell Foundation at a gain of $1,568.48. Ultimate Finding This parcel*280 was held by Andrew Tell primarily for sale to customers in the ordinary course of its trade or business. Mortuary Building The Mortuary Building was constructed on the residual portion of land which had been individually acquired by Tell and donated to the Bethany Bible Church. Tell built the church and had a small residual piece, a corner lot, left. In February of 1959, Tell was approached by Ackerman, a mortician, to construct a building on the property. On March 2, 1959 Andrew Tell purchased the land from Tell for $35,000, constructed the building through Construction, completed in June 1959, for $75,000 and entered into a 15-year lease with Memorial Chapels, Inc., Ackerman's corporation, granting Memorial an option to purchase the building for $175,000, exercisable within three years from June 1959. Tell subsequently learned that Ackerman had misrepresented his finances and, when approached by a Tucson realtor at a time when Ackerman had defaulted in his lease, sold the building on November 24, 1961, to Chapel of Memories for $170,500. During the period the building was held Andrew Tell received $43,500 rent and claimed $9,971.43 depreciation. The building was sold at a gain*281 of $68,936.10. Ultimate Finding The Mortuary Building was held by Andrew Tell primarily for sale to customers in the ordinary course of its trade or business. U-Totem Building Andrew Tell purchased land not in an industrial district for $30,000, by deed dated January 9, 1961. In October 1960 Andrew Tell leased the land and building (to be constructed) to U-Totem Markets for 15 years at a monthly rental of $625. No option was granted. On August 29, 1960, Andrew Tell contracted with Construction for construction of the U-Totem Building for $35,500. The building was completed January 31, 1961. In January 1962 the building was sold to John Zvara, a close friend of Tell's. During the year the building was held, Andrew Tell received $7,500 rent and claimed $2,288.34 depreciation. The building was sold at a gain of $8,420.89. Ultimate Finding The U-Totem Building was held by Andrew Tell primarily for sale to customers in the ordinary course of its trade or business. Milgram Building The Milgram Building (Tract B, Grand Industrial District), acquired from Esther and Benny Rhodes in March 1958 in exchange for stock, was constructed by Tell in December 1955 at a cost of $5,082.28, *282 sold in October 1956, to the Rhodes for $9,875. In March 1961 Andrew Tell leased the building to M. and M. Graham for a period of ten years and granted an option to purchase the building, exercisable within a three-year period. In January 1962 the building was sold to Michael Tell, a brother of Tell at a gain of $2,010.12. During the period this building was held, $6,360 rent was received and $2,331.92 depreciation was claimed. Ultimate Finding The Milgram Building was held by Andrew Tell primarily for sale to customers in the ordinary course of its trade or business. Hicks Building The Hicks Building was constructed on land (lot 18, Rae Industrial District Unit One) purchased from Tell on February 28, 1959 for $5,000. On January 19, 1959 Andrew Tell leased the land and a building to be constructed thereon to John and F. Hicks for ten years exercisable within three years of March 1, 1959, granting an option to purchase for $36,000. Andrew Tell contracted with Construction for construction of the building for $25,000, completed in 1959 at a cost of $24,792. Tell signed the construction contract for both parties. The building was expanded and a supplemental option at $58,000*283 granted in September of 1961 exercisable within three years from that date. In June 1962 the building was sold to the Tell Foundation for $49,100. During the period this building was held, Andrew Tell received $13,485 rent and 568 claimed $5,393.56 depreciation. The building was sold at a gain of $4,194.36. Ultimate Finding The Hicks Building was held by Andrew Tell primarily for sale to customers in the ordinary course of its trade or business. Formette Building On July 23, 1957 the Tells leased lot 19, Payne Industrial District, Unit Two and a building to be constructed thereon to W.C. and G. Munsil for ten years from the date of completion and acceptance of the building, granting the Munsils an option to purchase the building for $35,000, exercisable within three years from completion of the building. Tell constructed the building at a cost of $19,636.44. On March 7, 1958, the Tells transferred the building to Andrew Tell in exchange for stock. On November 13, 1958 Andrew Tell entered into a supplemental lease with the tenant leasing the original building and an addition to be constructed and granting the tenant an option to purchase the building with the addition*284 for $41,500. On December 5, 1958, Andrew Tell contracted with Construction for construction of the addition for $5,000, which was completed in January 1959 at a cost of $5,079.77. Tell signed the construction contract for both parties. The Munsils assigned the leasehold to Laminates of Phoenix and Laminates assigned the leasehold to J. and R. Rockus who negotiated in August 1961 a new tenyear lease with a new three-year purchase option. The option was exercised and, in July 1962, J. and R. Rockus purchased the building for $40,420. During the period the building was held, $18,120 rent was received and $4,222.39 depreciation claimed. The building was sold at a gain of $19,450.99. Ultimate Finding The Formette Building was held by Andrew Tell primarily for sale to customers in the ordinary course of its trade or business. Lot 16, Collins Addition On or about May 2, 1959, Andrew Tell acquired lots 16, 17, 18, and 19, Block 52, Collins Addition from Land (See Master Metal Finish Building, 1961, supra.) Lot 16 was sold on September 5, 1962 to First National Bank of Arizona, Trustee at a gain of $668.90. Ultimate Finding Lot 16, Collins Addition was held by Andrew Tell primarily*285 for sale to customers in the ordinary course of its trade or business. 1963 Brewer, et al., Land, S. 140' On December 10, 1962, Andrew Tell sold a portion of the Brewer land, acquired September 14, 1959, to Phoenix Title and Trust Company, as Trustee of Trust No. L30-782, to accommodate the tenant of a building owned by the trust desiring to lease adjacent land. This parcel was sold for $3,750 at a gain of $1,302.67. Ultimate Finding This parcel was held by Andrew Tell primarily for sale to customers in the ordinary course of its trade or business. Baby Formula Building On April 23, 1962 Andrew Tell leased a portion of the Brewer land and a building to be constructed thereon to Baby Formula Service of Arizona, Inc. for ten years from the date of completion and acceptance of the building, granting an option to purchase the building for $55,000 exercisable within three years from completion of the building On April 30, 1962 Andrew Tell contracted with Construction for construction of the building for $45,000. The building was completed in June 1962 at a cost of $46,875.70. Tell signed the construction contract for both parties. On December 26, 1962, Andrew Tell sold*286 the Baby Formula Building to John and B. Slivka, Jr., Tell's nephew, for $53,600. During the seven months Andrew Tell held the building it received $1,650 rent and claimed $675 depreciation. The building was sold at a gain of $7,753.79. Ultimate Finding The Baby Formula Building was held by Andrew Tell primarily for sale to customers in the ordinary course of its trade or business. Natural Rock Building On October 29, 1957 the Tells leased lot 25, Payne Industrial District, Unit Two, and a building to be constructed thereon, to Natural Rock Co., E.W. Russell, president, for 15 years from the date of completion and acceptance of the building granting the tenant an option to purchase 569 for $24,000, exercisable within five years. Tell built the building, completed in December 1957, for $12,742.98. On March 7, 1958 the Tells transferred the building to Andrew Tell in exchange for stock. On April 19, 1963, Andrew Tell sold the building to First National Bank of Arizona as Trustee of Trust No. 90-118, for $19,000. During the period this building was held $14,200 rent was received and $3,334.13 depreciation taken. The building was sold at a gain of $7,597.12. Ultimate Finding*287 The Natural Rock Building was held by Andrew Tell primarily for sale to customers in the ordinary course of its trade or business. Lot 17, Collins Addition On February 20, 1963 Andrew Tell sold lot 17, Collins Addition acquired May 31, (See Master Metal Finish Building, supra) to First National Bank of Arizona, as Trustee, for $4,500 at a gain of $250. Ultimate Finding Lot 17, Collins Addition was held by Andrew Tell primarily for sale to customers in the ordinary course of its trade or business. W. i/2 Tract C, Grand Industrial District On April 4, 1961, Andrew Tell purchased the W. i/2 Tract C, Grand Industrial District from the Tells. The land was purchased for the construction of a building and a lease but the transaction did not materialize. In March 1963 Ambel was in a position to develop the property while Andrew Tell was not, so Andrew Tell sold the land to Ambel. The land was sold for $10,000, at a gain of $2,582.27. Ultimate Finding W. i/2 Tract C, Grand Industrial District was held by Andrew Tell primarily for sale to customers in the ordinary course of its trade or business. 1964 Part of Section 27, T2N, R2E On October 8, 1963, Andrew Tell*288 sold a portion of this land, acquired in 1959, to Phoenix Title and Trust Co., Trustee, for $7,500, at a gain of $3,918.28. Ultimate Finding Part of Section 27, T2N, R2E, was held by Andrew Tell primarily for sale to customers in the ordinary course of its trade or business. Burdett and Cunningham Land On August 26, 1964 Andrew Tell sold a portion of the Burdett and Cunningham land, acquired on February 23, 1960, to Mountain State Telephone and Telegraph for $26,500 at a gain of $8,153.65. This land was held as were other undeveloped parcels of land for eventual development, lease and ultimate sale to industrial tenants of Andrew Tell's. There is no evidence the land was held primarily for investment purposes. Ultimate Finding Burdett and Cunningham land was held by Andrew Tell primarily for sale to customers in the ordinary course of its trade or business. Ornamental Iron Building On February 28, 1963 Andrew Tell leased part of section 27, T2N, R2E, acquired July 29, 1960, and a building to be constructed thereon to Chu-Bra-Ran Investment Co. for 20 years from the date of completion and acceptance of the building, granting the tenant an option to purchase the building*289 for $65,000 exercisable within three years from completion of the building. On April 12, 1963, Andrew Tell contracted with Construction for construction of the building for $35,000. The building was completed in June 1963 at a cost of $36,727.38. Tell signed the construction contract for both parties. On January 10, 1964 Andrew Tell sold the building to the tenant for $65,000 pursuant to its option. During the seven months Andrew Tell held the building, it received $3,750 rent and claimed $612.50 depreciation. The building was sold at a gain of $18,687.68. Ultimate Finding The Ornamental Iron Building was held by Andrew Tell primarily for sale to customers in the ordinary course of its trade or business. Restaurant Building On June 15, 1963, Andrew Tell leased part of section 27, T2N, R2E, acquired July 29, 1960, and a building to be constructed thereon to Chu-Bra-Ran 570 Investment Co. for 15 years from the date of completion and acceptance of the building, granting the tenant an option to purchase for $30,000 exercisable within three years. On May 29, 1963, Andrew Tell contracted with Construction for construction of the building for $10,000. The building was completed*290 in August 1963 at a cost of $9,800.43. Tell signed the construction contract for both parties. On February 7, 1964 Andrew Tell sold the building to Chu-Bra-Ran for $30,000 pursuant to its exercise of its option. During the six months Andrew Tell held the building it received $1,550 rent and claimed $100 depreciation. The building was sold at a gain of $11,917.67. Ultimate Finding The Restaurant Building was held by Andrew Tell primarily for sale to customers in the ordinary course of its trade or business. Collier Building On December 27, 1961 Tell leased part of lot 23, Hadsell's Addition (See Quality Building, supra) and a building to be constructed thereon to Collier Insullation, Inc. for five years at a monthly rental of $425 and granted Collier a three-year purchase option at $42,000. On December 28, 1961 Tell contracted with Construction for construction of the building for $23,000. On October 1, 1962 Tell transferred the Collier Building to Andrew Tell in exchange for stock. On June 3, 1964 Andrew Tell sold the building to Collier for $42,000 under the terms of its option. During the period this building was held, $8,500 rent was received and $1,798.88 depreciation*291 taken. The building was sold at a gain of $1,281.88. Ultimate Finding The Collier Building was held by Andrew Tell primarily for sale to customers in the ordinary course of its trade or business. During its taxable years ended September 30, 1961, 1962, 1963, and 1964 Mary Tell made the following sales of property held for more than six months, the gain from which the Commissioner has determined to be taxable as ordinary income rather than as capital gain as reported on its returns. 1961 Southwest Metals Building On January 19, 1957 the Tells leased to Southwest Metal Industries, Inc., lots 16, 17, and 18, Payne Industrial District, Unit 2, and the Southwest Metals Building to be constructed thereon, for 15 years from the date the building was completed and accepted. With the lease, the tenant was granted an option to purchase the land and building for $46,000, exercisable within four years from completion of the building. Tell built the building, completed in March 1957, for $26,312.32. On January 13, 1958, a supplemental lease and option were entered into for an addition to be built. The supplemental option price was $56,500. On March 7, 1958, the Tells transferred the*292 Southwest Metals Building to Mary Tell in exchange for Mary Tell stock. On April 8, 1958, a second supplemental lease and option were entered into for a second addition to be built. The second supplemental option price was $65,000. On April 9, 1958, Mary Tell contracted with Construction for construction of the addition for $7,000. At the request of Edward Adams, president of Southwest Metals Industries, the option was extended for a one-year period, and on March 31, 1961, Mary Tell sold the land and building to Adams, pursuant to his exercise of the option, for $63,380. During the period this building was held, $19,015 rent was received and $5,673.94 depreciation was taken. The building was sold at a gain of $29,741.56. Southwest Metals was a growing company, which had previously rented other property. When its leases expired it had been forced to move. In his lease negotiations with Tell, Adams had requested that an option to buy be included and this option was a crucial part of the negotiations. Ultimate Finding The Southwest Metals Building was held by Mary Tell primarily for sale to customers in the ordinary course of its trade or business. E. 100' Lot 26, Grand Industrial*293 District This lot, on which there was a building, was acquired by Mary Tell on May 2, 1961 in exchange for the Snow Cap Building, lot 9, Grand Industrial District. On June 1, 1961, it was sold to J. and M. Girard at a gain of $1,486.56. Ultimate Finding E. 100' Lot 26, Grand Industrial District was held by Mary Tell primarily for sale to customers in the ordinary course of its trade or business. 571 1962 Furniture Lines Building Mary Tell purchased East 60 feet of the West 126', Tract A, Plat 1, 2985 West Orborn Road from Martin David and Julius Rubenstein in November 1960. At the time of purchase Mary Tell leased the land and Furniture Lines Building, to be constructed thereon, to Louis Zaslow for ten years. With the lease Mary Tell gave Zaslow an option to purchase the building for $44,000, exercisable within three years from completion of the building. Mary Tell contracted with Construction for construction of the building for $20,000. The building was completed February 1, 1961. On December 1, 1961, Mary Tell sold the building to Zaslow for $44,000, pursuant to his option. During the ten months Mary Tell held the building, it received $1,760 rent and claimed*294 $992 depreciation. The building was sold at a gain of $5,768.69. Ultimate Finding The Furniture Lines Building was held by Mary Tell primarily for sale to customers in the ordinary course of its trade or business. Engine Power Building By deed dated March 24, 1961, Mary Tell acquired lots 40 to 52, inclusive and lots 58 to 63, inclusive, Rae Industrial District from Tell and Mary J. Tell in exchange for Mary Tell stock. On January 6, 1961, Mary Tell leased to Ben and S. Tobin lot 51 and the building to be constructed thereon for ten years from completion and acceptance of the building. An option to purchase the building for $45,850 was granted, exercisable within three years from completion of the building. On January 31, 1961, Mary Tell contracted with Construction for construction of the building for $30,000. Construction completed the building in April 1961 at a cost of $24,126.99. Tell signed the construction contract for both parties. On December 1, 1961, Mary Tell sold the building to Dean Kovar, Tell's personal physician, for $44,350. Kovar would, from time to time, request to purchase an investment property from Tell. During the eight months Mary Tell held the Engine*295 Power Building, it received $3,600 rent and claimed $1,191 depreciation. The building was sold at a gain of $13,565.80. Ultimate Finding The Engine Power Building was held by Mary Tell primarily for sale to customers in the ordinary course of its trade or business. Pacific Guano Building On December 21, 1955, Tell leased part of lot 1, Section 18, Tract A, Midway Industrial District and the Pacific Guano Building, to be constructed thereon, to Pacific Guano for ten years at a monthly rental of $225. Pacific Guano was given an option to purchase the land and building for $25,000 exercisable within three years. Tell constructed the building, completed March 1, 1956, at an approximate cost of $14,000. On March 1, 1958 Tell transferred the land and building to Mary Tell in exchange for stock. On February 12, 1962, at a time when the option had expired, Mary Tell sold the building to the Tell Foundation for $20,000, which on January 28, 1963 sold to Pacific Guano for $25,000. During the period the building was held by Tell and Mary Tell $10,800 rent was received and $1,897.20 depreciation taken. The building was sold at a gain of $10,259.03. Ultimate Finding The Pacific Guano*296 Building was held by Mary Tell primarily for sale to customers in the ordinary course of its trade or business. L.C.S. Building On August 7, 1959, the Tells sold lot 46, Grand Industrial District to Mary Tell for $5,000. Thereupon, Mary Tell leased the lot and the building to be constructed thereon to L.C.S. Corp. for 15 years from completion and acceptance of the building. Mary Tell gave L.C.S. an option to purchase the building for $36,700, exercisable within three years of completion of the building. On August 10, 1959, Mary Tell contracted with Construction for construction of the building for $20,000. Construction completed the building on November 1, 1959 at a cost of $18,393.15. Tell signed the construction contract for both parties. On February 5, 1962, L.C.S. assigned the lease and option to A.M. Bond, who subsequently, on April 30, 1962, exercised the option and purchased the building for $36,060. During the period Mary Tell held the building, it received $5,347 rent and claimed $2,935.33 depreciation. The building was sold at a gain of $13,164.11. Ultimate Finding The L.C.S. Building was held by Mary Tell primarily for sale to customers in the ordinary course of*297 its trade or business. 572Ari-Togs Building On March 17, 1961, Mary Tell leased lots 40 and 41, Rae Industrial District, acquired March 24, 1961 from the Tells in exchange for stock (see Engine Power Building, supra), and the building to be constructed thereon to Ari-Togs for 15 years from the date of completion and acceptance of the building. An option was granted to purchase the building for $150,000 exercisable within five years from completion of the building. On March 27, 1961, Mary Tell contracted with Construction for construction of the building for $95,000, extras $613.95. Construction completed the building in July 1961 at a cost of $89,269.99. Tell signed the construction contract on behalf of both parties. In June 1962 Mary Tell exchanged the Ari-Togs Building with Floyd and Marilyn Hamman for three smaller income-producing properties. The Hammans desired a rental property with a greater cash flow than the properties they traded. The Hammans still own the Ari-Togs Building. During the 11 months Mary Tell held the building, it received $12,500 rent and claimed $5,256.52 depreciation. The building was sold at a gain of $52,080.60. Ultimate Finding The Ari-Togs*298 Building was held by Mary Tell primarily for sale to customers in the ordinary course of its trade or business. Lot 52, Rae Industrial District On December 14, 1961, Mary Tell leased lot 52, acquired March 24, 1961 from the Tells in exchange for stock (see Engine Power Building, supra), to I.C. Hale, the lease to run from January 1, 1962 to February 15, 1970. An option was granted to purchase the lot for $8,000, exercisable within three years. On July 13, 1962, Mary Tell sold the lot to First National Bank, Trustee, for $4,500. The lot was sold at a gain of $2,157.21. Ultimate Finding Lot 52, Rae Industrial District was held by Mary Tell primarily for sale to customers in the ordinary course of its trade or business. 1963 Cody Building The Cody Building, Alhambra District, was acquired on June 1, 1962 from Floyd and Marilyn Hamman as one of the three buildings exchanged for the Ari-Togs Building (see Ari-Togs Building, supra). The building was under lease when acquired. On January 17, 1963 Mary Tell sold the Cody Building to the Tell Foundation for $17,000. During the eight months Mary Tell held the building it received $940 rent and claimed $374 depreciation. The*299 building was sold at a gain of $2,608.84. Ultimate Finding The Cody Building was held by Mary Tell primarily for sale to customers in the ordinary course of its trade or business. Snow Cap Building The Snow Cap Building to be constructed on lot 9, Grand Industrial District, was leased February 2, 1955 by the Tells to J.H. and M. Nelson for ten years from completion of the building. The tenant was given the right of first refusal if the building was offered for sale. Tell built the building for $6,432.11. On June 10, 1955 the Tells sold the building to Phoenix Title and Trust as Trustee, Trust L-330 for $7,372. On March 7, 1958, Trust L-330 transferred the building to Mary Tell in exchange for stock. On May 2, 1961, Mary Tell traded the building with Floyd and Marilyn Hamman for lot 26, Grand Industrial District (see lot 26, Grand Industrial District, supra). On May 23, 1962 Floyd and Marilyn Hamman sold the Snow Cap Building back to Mary Tell for $20,000, which sold the building February 1, 1963 to Solomon and Vera Doubchan for $20,000, at a loss of $201.85. Ultimate Finding The Snow Cap Building was held by Mary Tell primarily for sale to customers in the ordinary*300 course of its trade or business. Maryvale Post Office Building In July 1960 Mary Tell purchased land at Indian School Road and Maryvale Parkway from John F. Long for a nominal consideration as Long desired a post office constructed in his development. On April 13, 1960 Mary Tell leased the land and building to be constructed to the United States Post Office for ten years from completion of the building, five years at $9,000 per annum, five years at $8,700 per annum. On May 2, 1960 Mary Tell contracted with Construction for construction of the building for $75,000. On February 4, 1963, Mary Tell sold the building to First National Bank Trust Number 90-198 for $71,500. 573 During the period it held the building Mary Tell received $21,545 rent and claimed $10,082.20 depreciation. The building was sold at a gain of $6,329.70. Mary Tell was in need of funds at the time of sale. Ultimate Finding The Maryvale Post Office Building was held by Mary Tell primarily for sale to customers in the ordinary course of its trade or business. Lot 63, Rae Industrial District Unit 3 Mary Tell acquired lot 63 on March 1, 1961, from the Tells in exchange for stock. On April 1, 1963 Mary*301 Tell sold the lot, unimproved, to Williamson for $15,000 at a gain of $8,069.99. Ultimate Finding Lot 63, Rae Industrial District, Unit 3, was held by Mary Tell primarily for sale to customers in the ordinary course of its trade or business. Lot 9, San Clemente Estates On January 24, 1962, the Tells transferred their residence to Mary Tell in exchange for stock. The residence, 3342 E. Camelback, was under a one-year lease at the time. On May 1, 1963 the residence was traded for lot 9, San Clemente Estates, owned by Mildred's Happy Home. Mildred's Happy Home, now the Camelback Girl's Home, was having zoning problems and Tell, being interested in having a girl's home established, and his residence being properly zoned for a girl's home, made the trade upon encouragement of the City of Phoenix. Lot 9, San Clemente Estates was poor property, vacant most of the time and was not the type of property Mary Tell wished to hold. On August 27, 1963 Mary Tell sold lot 9 to First Trust and Development Corp. for $65,000 at a gain of $41,485.08. Mary Tell's basis in lot 9 was the original cost of the Tell residence. Ultimate Finding Lot 9, San Clemente Estates was not held by Mary*302 Tell primarily for sale to customers in the ordinary course of its trade or business. Wills Building Mary Tell purchased lot 17, Grand Industrial District from Western Hardware in September 1962. A ten-year lease was immediately entered into with John G. and R. Wills and an option to purchase the building, to be constructed, for $50,000 granted, exercisable within three years. The building was completed November 1, 1962. On September 3, 1963, Mary Tell sold the building to the Wills for $50,000 pursuant to their exercise of their option. During the ten months the building was held Mary Tell received $4,250 rent and claimed $1,649.70 depreciation. The building was sold at a gain of $8,425.90. Ultimate Finding The Wills Building was held by Mary Tell primarily for sale to customers in the ordinary course of its trade or business. 1964 Loftin Building On May 12, 1957, the Tells leased to C. and P. Loftin and C. and K. Loftin lot 41 and the north i/2 of lot 42, Grand Industrial District, and a building to be constructed thereon for 15 years from completion and acceptance of the building. With the lease, an option was granted to purchase the building for $96,000, exercisable*303 within five years. Tell constructed the building at a cost of $49,993.09, and completed it on October 15, 1957. On March 7, 1958, the Tells transferred the Loftin Building to Mary Tell in exchange for stock. On October 14, 1963, after the option had expired, Mary Tell sold the building to Loftin's Business Forms for $93,000. During the period this building was held by the Tells and by Mary Tell, $53,600 rent was received, and $11,171.11 depreciation taken. The building was sold at a gain of $51,128.40. Mary Tell needed funds with which to pay interest and taxes at the time the building was sold. Ultimate Finding The Loftin Building was held by Mary Tell primarily for sale to customers in the ordinary course of its trade or business. Wilmar Building On October 1, 1959 Mary Tell purchased lots 44 and 45, Grand Industrial District from the Tells for $10,000. On September 21, 1959 Mary Tell leased lot 44 and a building to be constructed thereon to Wilmar Distributors for ten years from completion and acceptance of the building. With the lease the tenant was given the option to purchase lot 44 and the building for $19,500, exercisable within three years from completion of the*304 building. On September 574 18, 1959 Mary Tell contracted with Construction for construction of the building for $10,000. The building, completed on November 10, 1959 was constructed at a cost of $9,042.78. Tell signed the construction contract for both parties. On January 16, 1961 Mary Tell gave Wilmar Distributors an option to purchase lot 45 for $10,000, exercisable within one year from that date. On January 31, 1962, the option to purchase lot 45 was extended for an additional year. On October 18, 1963 Mary Tell entered into a new lease with Wilmar Distributors, leasing lots 44 and 45 for ten years and granting an option to purchase both lots for $31,500, exercisable within five years. On November 4, 1963 Mary Tell sold lots 44 and 45, with the Wilmar Building, to Floyd and Marilyn Hamman for $22,105. During the period Mary Tell held these lots, it received $10,846.66 rent and claimed $2,227.23 depreciation. The lots with the building were sold at a gain of $3,381.62. Ultimate Finding The Wilmar Building was held by Mary Tell primarily for sale to customers in the ordinary course of its trade or business. Furniture Mart Building Mary Tell acquired the Furniture Mart*305 Building, lot 4, except the West 50 feet, Payne Industrial District, on March 7, 1958 from the Tells in exchange for stock. The building, acquired by the Tells on July 15, 1957, was subject to lease to Joseph and Rose Parker, doing business as Furniture Mart for ten years and an option to purchase for $60,000 exercisable within three years from July 15, 1957. The option was extended for three years from May 16, 1963. On February 3, 1964 Mary Tell sold the Furniture Mart Building to the Tell Foundation for $58,000. During the period Mary Tell held the building it received $35,000 rent and claimed $5,895.37 depreciation. The building was sold at a gain of $36,296.47. Ultimate Finding The Furniture Mart Building was held by Mary Tell primarily for sale to customers in the ordinary course of its trade or business. Lot 58, Rae Industrial District The Tells transferred lot 58, Rae Industrial District to Mary Tell on March 31, 1961 in exchange for stock. On June 3, 1964 Mary Tell sold the lot to Andrew Tell for $10,589.92 at a gain of $1,694.39. Ultimate Finding Lot 58, Rae Industrial District was held by Mary Tell primarily for sale to customers in the ordinary course of its*306 trade or business. Kerley Chemical Building In its taxable years ending September 30, 1961 and 1962 Mary Tell reported as a net long-term capital gain the amounts of $9,215.46 and $8,479.36, respectively, realized upon collections from an installment sale of the Kerley Chemical Building held for more than six months and sold on February 6, 1961. By deed dated June 23, 1959, the Tells sold lots 47 and 48, Grand Industrial District to Mary Tell for $10,000. On March 16, 1959, Mary Tell leased lots 47, 48, and 49 (acquired separately) and a building to be constructed to Kerley Chemical Corp. for ten years from completion and acceptance of the building. Kerley Chemical was given an option to purchase lot 49 for $37,500 and lots 47 and 48 for $15,000, exercisable within five years from completion and acceptance of the building. On March 13, 1959, Mary Tell contracted with Construction for construction of the building for $18,000. Construction completed the building on July 1, 1959 at a cost of $19,551.89. Tell signed the construction contract for both parties. On February 6, 1961, Mary Tell sold lots 47, 48, and 49 to Kerley Chemical for $51,150 pursuant to the options. During the*307 period the building was held Mary Tell received $8,100 rent and claimed $1,745.92 depreciation. The lots and building were sold at a gain of $17,694.82. Ultimate Finding The Kerley Chemical Building was held by Mary Tell primarily for sale to customers in the ordinary course of its trade or business. During its taxable years 1961, 1962, 1963, and 1964, Ambel Investment Co. (Ambel) made the following sales of property held for more than six months, the gain from which the Commissioner has determined to be taxable as ordinary income rather than as capital gain as reported on Ambel's returns. 1961 Abert Building The Abert Building was built on land (W. 160 feet, S. 140 feet, Ex. W. 110 feet, Tract A, 575 Payne Industrial District) purchased from the Tells for $2,000, by deed recorded February 3, 1959. On January 26, 1959 Ambel leased the land and building (to be constructed) for ten years from the date the building was completed and accepted. In negotiating his lease with Tell, Jack Abert requested an option to purchase. An option to purchase the land and building for $21,000 was granted exercisable within three years from completion of the building. On January 30, 1959, Ambel*308 contracted with Construction for construction of the building for $8,500. The building, constructed at a cost of $8,778.35, was completed in March 1959. Tell signed the construction contract on behalf of both parties. On November 1, 1961 Ambel sold the land and building to Chu-Bra-Ran Investment and Development for $15,500. During the period Ambel held the Abert Building, it received $4,160 rent and claimed $1,326.98 depreciation. The building was sold at a gain of $5,866.96. Ultimate Finding The Abert Building was held by Ambel primarily for sale to customers in the ordinary course of its trade or business. 1962 Precise Metals Building On September 4, 1958, the original Precise Metals Building (W. 160 feet, S. 290 feet, Ex. S. 190 feet, Tract A, Payne Industrial), to be constructed by the Tells on land owned by them individually, was leased to Precise Metal Products Co. for ten years from the date the building was completed and accepted for a monthly rental of $720. An option to purchase the land and building for $31,500 was granted exercisable within three years from completion of the building. On September 11, 1958, the Tells contracted with Construction for construction*309 of the building for $20,000. The building was completed in November 1958 at a cost of $18,628.50. Tell signed the construction contract for both parties. On September 11, 1958, the Tells transferred the land and the building (to be constructed), to Ambel in exchange for Ambel stock. On August 18, 1959, Ambel sold the land and building to John and A. Slivka for $29,098.23. On December 16, 1959 the Tells sold land (W. 160 feet, S. 390 feet, Ex. S. 290 feet, Tract A, Payne Industrial District) adjacent to the Precise Metals Building, to Ambel for $5,000. On March 3, 1960, Ambel reacquired the Precise Metals Building from the Slivkas in exchange for other property. On February 18, 1960, Ambel leased the adjacent parcel, acquired from the Tells, and a new building to be constructed thereon to Precise Metal Products Co. for the remainder of the lease term of the original Precise Metals Building, i. e., from completion of the new building until November 1968. A new option was granted, exercisable within three years of February 18, 1960 covering both the original Precise Metals Building and the new building, to be constructed, granting the right to purchase both for $80,000. On March 8, 1960 Ambel*310 contracted with Construction to construct the building for $35,000. The building was completed in May 1960 at a cost of $31,919. Tell signed the construction contract for both parties. On January 5, 1962, Ambel sold the original and the new Precise Metals Buildings to J. Dean Kovar for $75,000, realizing a gain of $19,985.60. Ultimate Finding The Precise Metals Buildings (original and new) were held by Ambel primarily for sale to customers in the ordinary course of its trade or business. Ability Metals Building The Ability Metals Building was built on land (S. 200 feet Tract B, Payne Industrial Ex W. 350 feet) purchased from the Tells for $10,000, by deed recorded December 7, 1959. On November 19, 1958, Ambel leased the land and building (to be constructed) for 15 years from the time the building was completed and accepted. An option to purchase the land and building for $83,000 was granted the tenant exercisable within three years from date of completion of the building. On November 28, 1958 Ambel contracted with Construction for construction of the building for $45,000. The building was completed on January 1, 1959, at a cost of $43,254.21. Tell signed the construction*311 contract for both parties. On January 5, 1962, Ambel sold Ability Metals Building to Paul and Vega Brandel for $80,900. During the period Ambel held the building, it received $23,625 rent and claimed $7,424.93 depreciation. The building was sold at a gain of $32,993.88. At the time of this sale, Ambel needed money for the construction of the Automotive Sales Building. Ultimate Finding The Ability Metals Building was held by Ambel primarily for sale to customers in the ordinary course of its trade or business. 576 Capital Auto #1 Pt., Sec. 27 On November 22, 1961, Ambel leased to K. and A. Webb and J. and R. Hunt a parcel of land (Pt. Sec. 27) and a building (to be constructed thereon) for ten years from the date the building was completed and accepted. An option was granted to purchase the building for $30,000 exercisable within 5 years from the date of completion. On November 13, 1961, Ambel contracted with Construction for construction of the building for $15,000. The building was completed in January 1962 at a cost of $14,099. Tell signed the construction contract for both parties. On July 5, 1962 Ambel sold the land and building to D. and D. Burton for $27,000. During*312 the seven months Ambel held the building it received $1,250 rent and claimed $450 depreciation. The building was sold at a gain of $6,547.21. Ultimate Finding Capital Auto #1 was held by Ambel primarily for sale to customers in the ordinary course of its trade or business. Raichert Building On January 19, 1960 the Tells sold the land, lot 73, Rae Industrial District, Unit 3, to Walton J. Leesman for $3,000. On October 6, 1959 Ambel reacquired lot 73 from Leesman by purchase. On November 4, 1959 Ambel leased the land and building (to be constructed) to Ed Raichert, Inc. for ten years, granting an option to purchase the land and building for $22,000 exercisable within three years from completion of the building. On December 3, 1959 Ambel contracted with Construction for construction of the building for $14,000. The building was completed on December 30, 1959 at a cost of $12,813.51. Tell signed the construction contract for both parties. On August 7, 1962, Ambel sold the land and building to Ed Raichert, Inc. for $21,400 pursuant to its option. During the period Ambel held the building it received $6,000 rent and claimed $2,116.34 depreciation. The building was sold at a gain*313 of $4,493.24. Ultimate Finding The Raichert Building was held by Ambel primarily for sale to customers in the ordinary course of its trade or business. Winburne Land On May 8, 1961 Ambel acquired land from E. R. Winburne. The Bayer Building, sold December 3, 1962 to the tenant pursuant to an exercise of option, was constructed on this land, as was the Pulice Building which was owned by Ambel on September 30, 1964. There were four sales of undeveloped land Ambel deemed unsuitable for development by it, two of which were made during 1962: on September 4, 1962, Ambel sold a parcel to First National Bank of Arizona, as Trustee, for $3,500, realizing a gain of $1,919.88; on October 29, 1962 Ambel sold a parcel to Donald and M. Doyle for $4,800 realizing a gain of $3,206.72. Ultimate Finding The two parcels of Winburne land sold in 1962 were not held by Ambel primarily for sale to customers in the ordinary course of its trade or business. Augustin Building The Augustin Building was built on a parcel of land (Part of Sec. 27, T2N, R2E, Maricopa County) which Ambel purchased from C.H. and E. Hargrove on April 13, 1960. On December 12, 1961 Ambel leased the land and building*314 (to be constructed) to L. and H. Augustin for ten years from the date the building was completed and accepted, and granted the tenant an option to purchase the land and building for $75,000, exercisable within three years from the date of completion. On December 31, 1961 Ambel contracted with Construction for construction of the building for $55,000, extras $180. The building was completed January 1, 1962 at a cost of $53,082.27. Tell signed the construction contract for both parties. On October 4, 1962 Ambel sold the land and building to L. and H. Augustin for $75,000. During the nine months Ambel held the building it received $4,050 rent and claimed $1,925 depreciation. The building was sold at a gain of $11,278.21. Ultimate Finding The Augustin Building was held by Ambel primarily for sale to customers in the ordinary course of its trade or business. Bayer Building The Bayer Building was built on a portion of the Winburne land, supra, which Ambel purchased on May 8, 1961. On May 2, 1962 Ambel leased the land and building (to be constructed) to J. L. Bayer for a period of ten years granting the tenant an option to purchase the land and 577 building for $17,000 exercisable*315 within three years from the date the building was completed. On May 7, 1962 Ambel contracted with Construction for construction of the building for $10,000. The building was completed June 1, 1962 at a cost of $9,562.61. Tell signed the construction contract for both parties. On December 3, 1962 Ambel sold the land and building to J. L. Bayer for $17,000 pursuant to his exercise of his option. During the six months Ambel held the Bayer Building it received $825 rent and claimed $300 depreciation. The building was sold at a gain of $5,094.54. Ultimate Finding The Bayer Building was held by Ambel primarily for sale to customers in the ordinary course of its trade or business. 1963 Reliable Dry Wall Building On January 18, 1960 the Tells sold the land upon which the Reliable Dry Wall Building was later constructed (E. 100 feet, W. 800 feet, Tract N, Payne Industrial District, Unit 2) to Demore and Shepard for $10,000. Ambel purchased the land from Demore and Shepard for $9,240.75 by deed recorded March 15, 1961. On February 16, 1961 Ambel leased the land and building (to be constructed) to Reliable Dry Wall, A. Demore, president, for ten years from the date the building was*316 completed and accepted, and an option to purchase the land and building for $30,000 was granted the tenant, exercisable within three years from completion of the building. On March 15, 1961 Ambel contracted with Construction for construction of the building for $15,000. The building was completed on April 15, 1961 at a cost of $14,582. On January 2, 1963 Ambel sold the land and building to W. and N. Clanpitt, Tell's sister, for $25,900. During the period the building was held, Ambel received $5,100 rent and claimed $1,499.25 depreciation. The building was sold at a gain of $2,893.54. Ultimate Finding The Reliable Dry Wall Building was held by Ambel primarily for sale to customers in the ordinary course of its trade or business. Sales Service Engineering Building The Tells sold the land upon which this building was later constructed (lot 71, Rae Industrial District, Unit 3) to J. Halladay for $3,000, by deed recorded January 19, 1960. On October 6, 1959, Ambel purchased the land from Halladay. On November 2, 1959 Ambel leased the land and building (to be constructed) to U. and F. Thompson for ten years from the date the building was completed and accepted, and granted the*317 tenant an option to purchase the land and building for $17,500, exercisable within three years from completion of the building. On December 14, 1959 Ambel contracted with Construction for construction of the building for $10,000. The building was completed in January 1960 at a cost of $8,975.38. Tell signed the construction contract for both parties. On February 1, 1963, after their option had expired, Ambel sold the land and building to U. and F. Thompson for $17,020. During the period Ambel held the building, it received $5,520 rent and claimed $1,759.09 depreciation. The building was sold at a gain of $3,594.58. Ultimate Finding The Sales Service Engineering Building was held by Ambel primarily for sale to customers in the ordinary course of its trade or business. Snackmobile Building On June 10, 1958 the Tells leased a parcel of land, part of Tract A, Payne Industrial District, and a building (to be constructed thereon) to Southwest Service, Inc. for ten years from the date the building was completed and accepted, and granted the tenant an option to purchase the land and building for $23,500, exercisable within three years from completion of the building. On June 15, 1958, Tell*318 contracted with Construction to build the building for $15,000, extras $1,381.92. The building was completed in September 1958 at a cost of $15,358.66. Tell signed the construction contract for both parties. On September 11, 1958 the Tells conveyed the building, subject to the lease and option, to Ambel in exchange for Ambel stock. On February 5, 1963, Ambel sold the Snackmobile Building to Samuel and Rachel Shever for $22,000 to raise funds for the payment of dividends. During the period Ambel held the building it received $10,600 rent and claimed $3,626.44 depreciation. The building was sold at a gain of $8,866.80. Ultimate Finding The Snackmobile Building was held primarily for sale to customers in the ordinary course of its trade or business. 578 Twentieth Century Building The Tells sold the land upon which the Twentieth Century Building was built (Part of Tract C, Grand Industrial District) to Ambel for $7,500 by deed recorded March 10, 1959. On February 26, 1959 Ambel leased the land and building (to be constructed) to Twentieth Century Manufacturing Co. for ten years from the date of completion of the building, and granted the tenant an option to purchase the*319 building for $65,000, exercisable within three years from completion of the building. On March 2, 1959 Ambel contracted with Construction for construction of the building for $33,000. The building was completed in June 1959 at a cost of $32,715.38. Tell signed the construction contract for both parties. Twentieth Century subsequently went out of business and Alfred Nelson, with the aid of Serta Mattress, took over the business and requested to buy the building as he wished to expand his business. On March 15, 1963, after Twentieth Century's option had expired, Ambel sold the building along with another parcel of land acquired from Andrew Tell at a cost of $10,000, to Alfred E. Nelson for $73,350. During the period Ambel held this building it received $24,750 rent and claimed $6,864.75 depreciation. The building was sold at a gain of $29,168.95. Ultimate Finding The Twentieth Century Building was held by Ambel primarily for sale to customers in the ordinary course of its trade or business. Hargrove, et al., Land In April and June of 1960, in three purchases, Ambel acquired land from Hargrove, Muniz and Wirick. The Augustin Building, and the Capital No. 1 and Capital No. 2*320 Buildings were constructed on this land. The residue was sold, unimproved, to the First National Bank, as Trustee on May 31, 1963 for $9,000 at a gain of $4,490.04. Ultimate Finding The parcel of Hargrove land sold in 1963 was held by Ambel primarily for sale to customers in the ordinary course of its trade or business. Automotive Sales Building On May 24, 1962 Ambel purchased the land upon which the Automotive Sales Building was to be constructed (Part of Tract 26, Section 36, 1801 North Black Canyon Highway) from Automotive Sales Co. for $50,000. On the same day Ambel leased the land and building to Automotive Sales Co. for 15 years for a rental of $1,700 per month and granted Automotive Sales an option to purchase the land and building for $170,000, exercisable within three years from the date of completion of the building. On June 26, 1962 Ambel contracted with Construction for construction of the building, which was completed September 1, 1962 at a cost of $100,000. On March 5, 1963 Ambel sold the building to Automotive Sales Co. pursuant to its exercise of its option. The building was sold at a gain of $22,830.15. During the six months Ambel held the building it received*321 $10,200 rent and claimed depreciation of $2,980. Ultimate Finding The Automotive Sales Building was held by Ambel primarily for sale to customers in the ordinary course of its trade or business. 1964 Beach Building Ambel purchased the land upon which the Beach Building was to be constructed (Part of Tract N, Payne Industrial District) from the Tell Foundation for $7,500, by deed dated May 1, 1963. On April 26, 1963 Ambel leased the land and building (to be constructed) to Beach Building Specialties, Inc. for 15 years from the date the building was completed and accepted and granted the tenant an option to purchase the land and building for $30,000, exercisable within three years from the date of completion of the building. On April 16, 1963 Ambel had contracted with Construction for construction of the building for $20,000. The building was completed in June 1963 at a cost of $16,566.56. Tell signed the construction contract for both parties. On January 6, 1964 Ambel sold the building to the tenant for $30,000 pursuant to the tenant's exercise of its option. The building was sold at a gain of $3,087.85. During the period, seven months, Ambel held the building, it received*322 $1,350 rent and claimed $650 depreciation. Ultimate Finding The Beach Building was held primarily for sale to customers in the ordinary course of its trade or business. 579 Winburne Land During 1964 Ambel made two further sales of undeveloped land (see Winburne land, supra) which was deemed unsuitable for development by it; on January 10, 1964, to Donald and M. Doyle for $4,800 at a gain of $3,042.24 and on May 31, 1964 to Donald Martin for $3,200 at a gain of $2,189.14. Ultimate Finding The Winburne Land was not held primarily for sale to customers in the ordinary course of its trade or business. Scott Fastener Building On June 8, 1962, Construction purchased lots 15 and 16, Grand Industrial District from Western Harware Co. for $20,000. On July 6, 1962 Construction sold lot 16 to Ambel for $10,000, realizing no gain. On June 22, 1962 Ambel leased lot 16 and a building to be constructed thereon to Marshall Stuart for ten years, granting the tenant an option to purchase for $28,000 exercisable within three years. Ambel contracted with Construction for construction of the building which was completed July 6, 1962. On December 23, 1964, Ambel sold the building*323 to the tenant for $28,775, pursuant to the option. During the period Ambel held the building it received $7,975 rent and claimed $650 depreciation. The building was sold at a gain of $5,676.40. Ultimate Finding The Scott Fastener Building was held primarily for sale to customers in the ordinary course of its trade or business. During its taxable years ending September 30, 1961, 1962, 1963, and 1964, Investments made the following sales of property held for more than six months, the gain from which the Commissioner has determined to be taxable as ordinary income rather than as capital gain as reported on Investments' returns. 1961 Gross Building The Gross Building was built by Construction on lot 14, Grand Industrial District, which Investments acquired from Gross on April 5, 1960. Financing was secured, the building constructed and leased back to Gross with an option to purchase. Tell was aware that Gross would probably exercise the option as the transaction was more in the nature of a financing arrangement than the procurement of an investment property. The building was sold to Gross pursuant to his exercise of the option on October 7, 1960 at a gain of $756.17. Ultimate*324 Finding The Gross Building was held by Investments primarily for sale to customers in the ordinary course of its trade or business. Advance Building The Advance Building (Pt. SE. i/4, NW. i/4, Sec. 27, Rae Industrial), a single purpose corrugated metal building, was under lease when it was purchased at cost from the Tell-Rae partnership in 1957. The tenant subsequently went out of business. The original lease was for a period of ten years and the tenant had an option to purchase the building within three years of November 5, 1957. A new lease was made with Pipe Trades Industry Program, Inc. for a period of five years; no option to purchase was granted under the new lease. The building was sold on July 31, 1961 to Solomon and Vera Doubchan (Solomon was a retired doctor), who requested an investment. The building was sold as money was needed for other purposes and Tell believed the building might prove an unsuitable investment for Investments. The building was held for a period of 3 years and 8 months during which time Investments received $6,735 rent and depreciation in the amount of $2,559.23 was taken. The building was sold at a gain of $7,011.35. Ultimate Finding The*325 Advance Building was held by Investments primarily for sale to customers in the ordinary course of its trade or business. Van Valkenburgh Building The Van Valkenburgh Building (Pt. Sec. 27, Rae Industrial) was purchased at cost from the Tell-Rae partnership on September 30, 1958, and was under lease when acquired. The tenant, pursuant to an option to purchase within three years from October 1958, purchased the building on August 17, 1961. During the period the building was held rent was received in the amount of $3,972 and depreciation was taken in the amount of $668.21. The building was sold at a gain of $9,713.13. Ultimate Finding The Van Valkenburgh Building was held by Investments primarily for sale to customers in the ordinary course of its trade or business. 580 1962 Lorts Building On October 14, 1960 Investments purchased land (Pt. Sec. 25, Black Canyon Highway) from A. F. Lorts upon which to construct the Lorts Building. The land and building (to be constructed) were leased back to the Lorts and the Lorts given an option to purchase the building within three years of October 1960. Construction completed the building on November 1, 1960. The building was*326 sold to the Lorts on February 5, 1962 pursuant to their option. Investments received $7,000 rent and claimed depreciation of $2,217. The building was sold at a gain of $903.41. This transaction was similar in character to the transaction in respect to the Gross Building. Ultimate Finding The Lorts Building was held by Investments primarily for sale to customers in the ordinary course of its trade or business. Pulice Building The Pulice Building was built on land (lot 20, Rae Industrial District, Unit 1) previously sold by the Tell-Rae partnership to one Burton, reacquired from Burton by the Tells, and sold to Investments. Investments had a tenant, entered into a lease, contracted with Construction for construction of the building, and gave the tenant, Pulice, an option to acquire the building within three years from its completion in August 1960. The building was sold to John and A. Slivka, a brother-in-law and sister of Tell on February 23, 1962. During the period the building was held Investments received $1,900 rent and claimed $351.33 depreciation. The building was sold at a gain of $3,987.20. Ultimate Finding The Pulice Building was held by Investments primarily*327 for sale to customers in the ordinary course of its trade or business. Foley Building The Foley Building was constructed on land (W. i/2, lot 21, Rae Industrial) acquired by Investments from Halladay on October 25, 1960. Immediately upon acquisition, Investments entered into a lease with Foley for the land and building; no option to purchase was granted; and a construction contract entered with Construction. The building was completed on December 31, 1960. During the period the building was held Investment received $1,890 rent and claimed $345 depreciation. The building was sold to the Tell Foundation at a gain of $210. Ultimate Finding The Foley Building was held by Investments primarily for sale to customers in the ordinary course of its trade or business. 1963 Investments made no disposition of property during its taxable year 1963. 1964 Evans Nursery Building The Evans Nursery Building was built by Construction, completed in July 1963 for a school teacher, Evans, who desired a day nursery. It was located on an isolated piece of land (Pt. Sec. 24, T2N, R2E, Black Canyon Highway) outside of any of the industrial districts, acquired on February 5, 1962. The building*328 leased to Evans, who was given an option to purchase the building within three years of July 31, 1963, was a single purpose building and, after approximately a year of occupancy, the tenant decided to return to Chicago. Evans had secured a party who would not lease, but would buy the building, so on August 6, 1964, she exercised the option, and sold the building. During the period the building was held, Investments received $2,200 rent, and claimed $120 depreciation. The building was sold at a gain of $7,086.59. Ultimate Finding The Evans Nursery Building was held by Investments primarily for sale to customers in the ordinary course of its trade or business. In the taxable year ended September 30, 1961 Investments reported as a net long-term capital gain the amount of $48,933.88 realized upon collections from an installment sale of a parcel of improved real property, the Super Discount Building, held for more than six months. In June of 1959, Investments acquired lots 2, 4, 10, 11, 12, 15, 16 and 17 in Rae Industrial District, Unit 1, by purchase from Tell. The land plus a building to be constructed were leased to Shoppers Discount Corner, Inc; an option to purchase for a three-year*329 period granted; and a construction contract with Construction entered into for the 581 erection of the Shoppers Discount Building. The building was completed in October 1959. The land and building were sold in February of 1960 to Y. and S. Weinstein (the president of Shoppers Discount Corner, Inc.), J. and C. Chiapetta, and M. and M. Rosenbaum and the transaction treated as a sale of the building and a sale of the land and the profit realized on the sale of the land - $54,525.88 - reported on the installment basis, $5,592 in the taxable year ended September 30, 1960 and $48,933.88 in the taxable year ended September 30, 1961. Ultimate Finding This land was held by Investments primarily for sale to customers in the ordinary course of its trade or business. During its taxable years ending March 31, 1962, 1963, 1964, and 1965, Land made the following sales of property held for more than six months, the gain from which the Commissioner has determined to be taxable as ordinary income rather than as capital gain as reported on Land's returns. 1962 York Lift Building On March 6, 1958 the Tells transferred part of lot 7, Alhambra Tract, acquired on July 15, 1955, for industrial*330 development, to Land in exchange for Land stock. On November 23, 1959, Land leased lot 7 and a building, to be constructed thereon by Construction, to York Lift Sales and Service (York) for five years, granting York an option to purchase for $15,000 within two years from January 1, 1960. On January 5, 1962, Land sold the building to Mary Tell for $33,000 realizing a gain of $10,650.94. The depreciation taken on the building had been $1,537.04. Ultimate Finding The York Lift Building was held by Land primarily for sale to customers in the ordinary course of its trade or business. Deer Valley Land On March 14, 1962, Land sold five acres of unimproved land to Andrew Tell, which had a prospective tenant for whom to build a building, for $22,500, realizing a gain of $4,968.25. This land had been acquired by purchase in February 1960 from Marilyn Hamman. Ultimate Finding The Deer Valley Land was not held by Land primarily for sale to customers in the ordinary course of its trade or business. 1963 Midway Land The State of Arizona constructed a freeway through property (Sec. 19, Pinal County) owned by Land in Pinal County. On May 31, 1962, a 310-foot strip of this land, *331 about 11 i/2 acres, was sold to the State Highway Department for $4,750 at a gain of $4,272.29. Land had acquired this property from Tell on July 28, 1959 in exchange for Land stock. Ultimate Finding The Midway Land was not held by Land primarily for sale to customers in the ordinary course of its trade or business. Arizona City Building In 1961 Land purchased the land (Part Sec. 1, T85, R6E, Pinal County) upon which the Arizona City Building was to be constructed from Arizona City Development Corp. On June 13, 1961, Land leased the land and building (to be constructed) to Arizona City Development Corp. for 15 years for a rental of $1,000 per month, granting an option to purchase the building for $100,000 exercisable within three years from December 1, 1961. The building completed by Construction in December 1961, was sold to the tenant for $100,000 pursuant to its option on December 4, 1962. During the year Land held the building it received $11,000 rent and claimed $4,787.20 depreciation. The building was sold at a gain of $16,411.35. Tell was aware that the tenant would probably exercise the option as the transaction was more in the nature of a financing arrangement than*332 the procurement of investment property. Ultimate Finding The Arizona City Building was held by Land primarily for sale to customers in the ordinary course of its trade or business. Camelback Citrus Grove The Camelback Grove (E. i/2 lot 2, Block 12, Arcadia, Sec. 21, T2N, R4E), sold on January 21, 1963 to Scudder Development Co. for $63,800 at a gain of $90.48, was acquired from Tell on January 1, 1962 in exchange for Land stock. This grove was a portion of the citrus property acquired by Tell in the late 1940's. Ultimate Finding The Camelback Citrus Grove was not held by Land primarily for sale to customers in the ordinary course of its trade or business. 582 1964 Midway Land On October 21, 1963 Land sold an additional 34 i/2 acres of unimproved land to the State Highway Department at a gain of $8,097.05. On February 13, 1964, another 17 i/2 acres were sold to the State Highway Department at a gain of $5,893.48. The Midway Land had been acquired from Tell in March 1958 in exchange for Land stock. Ultimate Finding The Midway Land was not held by Land primarily for sale to customers in the ordinary course of its trade or business. 1965 Moss Land *333 On May 18, 1964 Land exchanged acreage (five acres) for a motel owned by Soilserv, Inc. The acreage, acquired by purchase for $10,572.08 from Paul and Lola Moss on April 11, 1960, was subject to a mortgage at the time of the exchange. The exchange was made by Land in order to rid itself of the mortgage. Land realized a gain of $9,427.92 on the exchange. Ultimate Finding The Moss Land was not held by Land primarily for sale to customers in the ordinary course of its trade or business. Wildman Land On June 10, 1964, Land sold acreage (20 acres) to Andrew Tell at a gain of $3,846.42. This land was acquired in December 1959 from Tell in exchange for Land stock. Ultimate Finding The Wildman Land was not held by Land primarily for sale to customers in the ordinary course of its trade or business. Stillion Land On June 26, 1964 one acre of land at Buckeye Road and 59th Avenue was sold to Verde Dickey for a sheet metal plant at a gain of $4,619.33. On August 24, 1964, another acre was sold to Bootstrap Trading Co., Inc., at a gain of $6,079.38. The Stillion Land had been acquired in 1958 from Tell in exchange for Land stock. Except for approximately ten acres of the 240*334 acres near Buckeye Road, Land still owns the Buckeye acreage transferred by Tell upon incorporation. Ultimate Finding The Stillion Land was not held by Land primarily for sale to customers in the ordinary course of its trade or business. Midway Land On July 28, 1964, Land sold additional acreage (24.1 acres) to the State Highway Department at a gain of $5,658.80. The Midway Land had been acquired from Tell in March 1958 in exchange for Land stock. Ultimate Finding The Midway Land was not held by Land primarily for sale to customers in the ordinary course of its trade or business. Tidwell Building On January 4, 1965, Land sold the Tidwell Building, Part of Tract C, Midway Industrial District to the tenant, Echeverria Feeding Co. The Tidwell Building was originally constructed by Tell in July 1957, leased for a period of five years, and conveyed, subject to lease and a purchase option exercisable within five years, to Land in March 1958 in exchange for Land stock. The building was sold after the expiration of the option period. During the period this building was held, Land received rent of $12,610, and claimed depreciation of $9,024.98. The building was sold for*335 $18,000 at a gain of $9,071.79. Ultimate Finding The Tidwell Building was not held by Land primarily for sale to customers in the ordinary course of its trade or business. During its taxable year ended June 30, 1964, Construction made the following sales of property held for more than six months, the gain from which the Commissioner has determined to be taxable as ordinary income rather than as capital gain as reported on Construction's return. 1964 Orange Julius Building On September 12, 1957, the Tells leased to J. and V. Piorkowski the East 75 feet of lot 5, Payne Industrial District (except the South 60 feet) and the Orange Julius Building, to be constructed thereon, for ten years from the date the building was completed and accepted. At the same time Tell began 583 construction of the building which was completed in December 1957 at a cost of $10,859. Tell also constructed, on the South 60 feet of the East 75 feet of lot 5, his own office, the Construction Building, at a cost of $5,000. The building was completed February 28, 1958. On March 1, 1958 the Tells transferred the East 75 feet of lot 5 to Construction in exchange for stock. In September 1963, Construction*336 sold the Orange Julius and Construction Buildings, including a part of Tract A, Payne Industrial District, to the Tells for $25,000, at a gain of $9,036.52. During the period Construction held these buildings, it collected $19,715 rent and claimed $5,568.21 depreciation. The transfer of the Orange Julius Building, under lease at the time of transfer, was to aid Construction in its formative years with rental income. The Construction Building was used as the construction office. These buildings were disposed of because Tell believed it best that Construction not have any properties except construction properties. Ultimate Finding The Orange Julius Building was held by Construction primarily for sale to customers in the ordinary course of its trade or business. Ga Po Building On April 15, 1959, the Tells sold the Ga Po Building, lot 19, Rae Industrial District, Unit 1, to Construction for $5,000. The Tells had leased this lot and the Ga Po Building to be constructed thereon. The building was completed June 30, 1959. Additions to the building were completed by Construction on December 31, 1961 and August 31, 1962. A new lease was entered into for ten years from September 1, 1962 and*337 the tenant was granted an option to purchase the building for $26,500, exercisable within three years from September 1, 1962. On September 1, 1963 Construction sold the Ga Po Building to Phoenix Title and Trust, as Trustee, for $22,000, at a gain of $1,462.35. During the period the building was held, Construction received $7,475 rent and claimed $2,967.97 depreciation. This building was disposed of because Tell believed it best that Construction not have any properties except construction properties. Ultimate Finding The Ga Po Building was held by Construction primarily for sale to customers in the ordinary course of its trade or business. Opinion Issue I: Character of Gain from Sales of Property We must decide whether various parcels of real estate sold by the petitioners during their respective taxable years before us, and with respect to some petitioners, parcels sold in prior years on installment sales contracts, payments under which were received by such petitioners during the years before us, constituted either "capital assets" within the meaning of section 1221 or "property used in the trade or business" within the meaning of section 1231, so that the gain from the*338 sales of such property may be taxed as capital gain. The term "capital asset," defined in section 1221, means property held by the taxpayer (whether or not connected with his trade or business), but does not include "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." The term "property used in the trade or business," defined in section 1231(b), means property used in the trade or business of a character which is subject to the allowance for depreciation provided in section 167, held for more than six months, and real property used in the trade or business, held for more than six months, which is not, among other things, "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." We must decide with respect to each property, the taxable character of the gain realized on the sale of which is in issue, whether it was "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." "Primarily" as used in this phrase means "of first importance" *339 or "principally." Malat v. Riddell, 383 U.S. 569. The purpose of excepting from capital gains treatment property which is so held is to tax the profits and losses, arising from the everyday operation of the business at ordinary rates, while permitting, with respect to qualifying property, the realization of appreciation preciation in value accrued over a substantial period of time to be taxed at the preferential rate. Malat v. Riddell, supra.The preferential capital gains treatment applies to transactions in property which are not the normal source of business income, being intended to relieve the taxpayer from the excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those 584 burdens on such conversions. Burnet v. Harmel, 287 U.S. 103, 106. Since capital gains treatment is an exception to the normal tax requirements of the Internal Revenue Code, the definitions of "capital asset" and of "property used in the trade or business" must be narrowly applied and their exclusions interpreted*340 broadly. This is necessary to effectuate the basic congressional purpose. The Supreme Court has always construed narrowly the term "capital asset. " See Hort v. Commissioner, 313 U.S. 28, 31; Kieselbach v. Commissioner, 317 U.S. 399, 403; and Corn Products Co. v. Commissioner 350 U.S. 46. We have found that a majority of the properties subject to our examination were held "primarily for sale to customers in the ordinary course of [the taxpayer's] trade or business." See our "Ultimate Findings." With respect to the gains realized upon the sales of those properties, we think it may safely be said that no congressional purpose whatsoever would be served by taxing them at capital rates. It is manifest that petitioners' profits from the transactions in those properties arose from the everyday operation of their respective businesses. We feel we should first state what we are not holding. The Commissioner relies primarily upon the large number of sales that petitioners made over a period of years. We think primary reliance here is misplaced. Petitioners are not engaged in the business of selling real estate, except insofar as the sales which*341 actually occurred here were an integral part of a larger business. We rely instead on the fact that the profits realized upon the sales of those properties arose from the everyday operation of petitioners' respective businesses. Those properties were held primarily for the purpose of eventual realization of the "everyday operation of business" profit which petitioners built into them. The interim rentals were merely incidental to this primary purpose. With respect to those properties, the appreciation in value which accrued over a substantial period of time, including the artificial appreciation resulting from the allowance of depreciation, was merely incidental to the holding of those properties for the primary purpose of realizing the entrepreneurially created value 4 of the property over its basis in the respective petitioners' hands. *342 In the case of other properties, we are persuaded that an investment intent, i. e., a holding for appreciation, at the time of sale overshadowed the holding for sale in the ordinary course of business purpose. In making our ultimate findings, we have considered separately the character of each individual property in the hands of the respective taxpayer-petitioner. We considered all of the facts in evidence which related to the acquisition, holding and sale of each property, including the following: the purpose for acquiring the property; the purpose for which the property was held after its acquisition and at the time of sale; the extent of any improvements made to the property during the holding period; the length of the holding period; the activities in respect to sales and the continuity and frequency of sales; and whether the property was held for investment purposes. Cf. Municipal Bond Corp., 46 T.C. 219; and see George K. Heebner, Jr., 32 T.C. 1162, affd. 280 F. 2d 228 (C.A. 3, 1960), in which, although involving the sale of a 585 single property, the taxpayer was engaged in "package building," a business very similar to that*343 in which petitioners here were engaged. With the exception of those properties which we found were not held primarily for sale to customers in the ordinary course of the taxpayer's trade or business, we uphold the Commissioner's determination on this issue. Issue II: Surtax Exemptions Section 269 provides that if any person or persons acquire or acquired, directly or indirectly, control of a corporation and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit or other allowance which such person would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit or other allowance. The purpose to avoid Federal income tax must exceed in importance all other purposes. Commodores Point Terminal Corp., 11 T.C. 411. The Commissioner has determined that Andrew Tell, Mary Tell, Ambel, Construction, and Land were formed for the principal purpose of avoidance of Federal income tax by securing the benefit of additional surtax exemptions provided by*344 section 11(d). There is no issue concerning the acquisition of "control" of these corporations. There is only the issue whether the purpose to avoid Federal income tax exceeded in importance all other purposes. The Commissioner's determination is presumptively correct. The burden of showing facts which will justify a conclusion to the contrary is on the petitioners. Joe (Joseph) Dillier, 41 T.C. 762. We are persuaded that Construction was not formed for the primary purpose of avoidance of Federal income tax. While Investments was incorporated on September 24, 1957 for the purpose of segregating certain leasing activities from the Tell-Rae partnership, Tell continued to engage in the hazardous construction business in his individual capacity. Construction was incorporated on February 21, 1958 for the purpose of engaging in the construction business exclusively, thus insulating the other activities from the loss hazards of the construction business. Since that date Construction has engaged in the construction business exclusively, and has performed numerous contracts as a general contractor. We think Construction was formed primarily for a valid business purpose, and*345 not to avoid Federal income tax. In the circumstances of this case, for the purpose of deciding this issue, we do not think that Construction and the other petitioners can fairly be said to have engaged in a single, integrated business enterprise. Compare Joe (Joseph) Dillier, supra. To the contrary, the proliferation of the investment corporations served no valid business purpose. While the ritual of separateness was scrupulously observed, i.e., formally separate stockholders' and directors' meetings, etc., the investment corporations engaged in essentially one and the same business. Indeed, it is not even argued that the conduct of that business by five corporations served any business purpose. Rather it served, we are told, a testamentary or other personal scheme of the Tells. Indeed it may have, and we have no doubt that such a purpose is a legitimate one as might, if the tax avoidance purpose were not primary, avoid the impact of section 269. However, we are not persuaded that the avoidance of Federal income tax was not the primary purpose behind the proliferation of these companies during each of the years in question. Accordingly, in respect to each petitioner*346 corporation, with the exception of Construction, we uphold the Commissioner's determination. Decisions will be entered under Rule 50. Footnotes1. Cases of the following petitioners are consolidated herewith: Tell Investments Co., Docket No. 3987-67; Ambel Investment Co., Docket No. 3988-67; Andrew P. Tell and Mary J. Tell, Docket No. 3989-67; Tell Construction Co., Docket No. 3990-67; Tell Land Co., Docket No. 3991-67; and Mary Tell Investment Co., Docket No. 3992-67.↩2. In the case of Tell Investments Co. and Mary Tell Investment Co. the amounts set forth above differ from the amounts set forth in the statutory notices of deficiency to such companies. In these statutory notices the Commissioner disallowed the surtax exemption claimed by Tell Investments Co. while allowing the surtax exemption claimed by Mary Tell Investment Co. By amendment to his pleadings the Commissioner has determined that Tell Investments Co. is entitled to the surtax exemption claimed by it, and has disallowed the surtax exemption claimed by Mary Tell Investment Co.↩3. All statutory references are to the Internal Revenue Code of 1954 unless otherwise specified.↩1. On October 29, 1962, Tell established trusts with the First National Bank of Arizona, Trustee. Trust No. 90402-90405 ("stock holding trusts") each hold 1,000 shares of Andrew Tell and 1437 i/2 shares of Mary Tell gifted by Tell. Trusts No. 94613-94616 ("insurance trusts") each own a life insurance policy on the life of Mary J. Tell. For a period slightly in excess of 10 own a life insurance policy on the life of Mary J. Tell. For a period slightly in excess of 10 years the income of the stock holding trusts may be distributed to and used by the insurance trusts to pay the premiums on the policies owned by the latter trusts. Each of Tell's daughters is the beneficiary of the stockholding trusts and the insurance trust. At the end of the trust term the stock in a stockholding trust reverts to Tell, or, if he is then deceased to Trust No. 9325, a trust established by Tell and Mary J. Tell with the First National Bank of Arizona, Trustee, for the purpose of administering the property in or coming to this trust upon their respective deaths. Under the provisions of Trust No. 9325 relating to the creation of "Children's Trusts," stock of Andrew Tell is to be held for the benefit of, and eventually distributed to, Esther; stock of Mary Tell is to be held for the benefit of, and eventually distributed to Marilyn; stock of Ambel is to be held for the benefit of, and eventually distributed to, Elisabeth; and stock of Investments is to be held for the benefit of, and eventually distributed to, Lydia. Mary J. Tell, at the same time Tell created these First National Bank trusts, created similar trusts (Trusts 90406-90409 and Trusts 94617-94620). Mary Tell gifted to each of the stockholding trusts (90406-90409), 1,000 shares of Andrew Tell and 1,437 i/2 shares of Mary Tell. Other than the insurance trusts (94617-94620) owing insurance on the life of Andrew P. Tell, and the reversion of the stock in the stock holding trusts (90406-90409) to Mary Tell upon expiration of the trust period, the terms and provisions of the trusts are identical to the terms and provisions of the trusts created by Tell, including the eventual disposition of stock of a corporation to a particular daughter under provisions of Trust No. 9325.↩1. See preceding page.↩*. With respect to Mary Tell, Trusts 90402-90409 provide that the principal (11,500 shares) reverts to Tell. Also, with respect to Andrew Tell, Trusts 90402-90409 provide that the principal (8,000 shares) reverts to Tell. ↩**. With respect to Land, 16,200 shares of the 30,102 shares were in the Grandchildren's trust and were Class B nonvoting stock.↩*. Total does not include an approximate gain of $200,000 which the Tells realized from the transfer of property for two paid-up annuity policies.↩*. Mildred's Happy Home↩*. Scott 12/23/64↩*. Three rental buildings and a 1959 Chevy P.U.↩4. Petitioners either acquired raw land, subdividing it and installing improvements thereon, or acquired from the Tells (or derivatively from another petitioner) such subdivided and improved lots either at cost or in exchange for stock (acquiring the transferror's, or cost, basis in such lots). The petitioner would then build, or contract with Construction to have built, a building of certain specifications, previously leased to a particular tenant. The petitioner's basis in the building would be approximately equal to its actual construction cost. Ordinarily the tenant would successfully negotiate for an option to purchase the building, and the option, absent unusual circumstances, would be exercised and the building sold within a three-year period at a substantial gain. The gain from the sale of the building would ordinarily reflect one or more of the following factors: (1) the increment in value that subdivided and improved realty has over the sum of the apportioned cost of the raw land and the cost of subdivision and improvement; (2) if the petitioner subdivided and improved the land himself (or acquired the basis of a transferor who did), the increment in value of such services over their cost to the petitioner; (3) the increment in the fair market value of the building at the time of its completion over its actual cost to the petitioner; (4) the increment of market value over cost attributable to Tell's entrepreneurial skill in putting together the final package, including the value of his ability to arrange financing, the "neighborhood" value created by the development of surrounding land in an industrial district, etc.; and (5) the appreciation in value accrued over the period of time the property was held in its various states of development (i. e., raw land, subdivided land, subdivided and improved land, land with building, etc.), including the recoupment of depreciation reflected in adjustments to the property's basis.↩